Lou SHAW; Eastborne Productions, Inc., Plaintiffs–Appellants,

v.

Richard LINDHEIM; Michael Sloan; Universal City Studios, Inc.; Columbia Broadcasting Systems; MCA Television, Ltd., Defendants–Appellees.

No. 88–6677.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1990.

Decided July 17, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 23, 1990.

Richard D. Aldrich, Westlake Village, Cal., and Marc J. Poster, Greines, Martin, Stein & Richland, Beverly Hills, Cal., for plaintiffs-appellants.

Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, Cal., for defendants-appellees.

Before ALARCON, BRUNETTI and O'SCANNLAIN, Circuit Judges.

ALARCON, Circuit Judge:

Lou Shaw and Eastbourne Productions, Inc. (Shaw) appeal from a grant of summary judgment in favor of Richard Lindheim, Michael Sloan, and three entertainment corporations (defendants). On appeal, Shaw argues that the district court erred in finding that, as a matter of law, there was no substantial similarity between his script entitled "The Equalizer" and defendants' pilot script for their "Equalizer" television series. Because a reasonable trier of fact could have found that the two works are substantially similar, Shaw argues, the district court erred in dismissing his copyright and Lanham Act claims on summary judgment. We reverse and remand.

## STATEMENT OF THE CASE

Lou Shaw is a well-known writer and producer in the entertainment industry in Los Angeles. At one time during the 1976–1977 television season, there were eight network television programs on the air that Shaw had created, written for, or produced.[1] In February 1978, Shaw entered into an option contract with Richard Lindheim, an executive in the Dramatic Programming Division of NBC Television, that granted NBC the option to develop "The Equalizer," a pilot script created by Shaw, into a television series. Shaw delivered the script to Lindheim on July 27, 1978. Lindheim read Shaw's script. Because NBC declined to produce it, all rights in the script reverted back to Shaw.

Lindheim left NBC in 1979 and began work for Universal Television. In 1981, Lindheim wrote a television series treatment entitled "The Equalizer." Lindheim admits that he copied the title of his treatment from Shaw's script. In 1982, defendant Michael Sloan expanded Lindheim's treatment, and the revised version became the pilot script for defendants' Equalizer series, which was broadcast on CBS beginning in 1985.

On November 19, 1987, Shaw filed an action for copyright infringement and unfair competition, alleging that defendants' pilot script and series were substantially similar to the script he had submitted. On August 8, 1988, defendants moved for summary judgment. On October 28, 1988, the district court found that there was no substantial similarity between the two works as a matter of law and granted summary judgment on Shaw's copyright and Lanham Act claims. Shaw timely appeals.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo: *Narell v. Freeman*, 872 F.2d 907, 909 (9th Cir.1989). "Although summary judgment is not highly favored on questions of substantial similarity in copyright cases, summary judgment is appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." *Id.* at 909–10. We have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity. *See Worth v. Selchow & Righter Co.*, 827 F.2d 569, 571 (9th Cir.1987) (citing cases), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988). Where reasonable minds could differ on the issue of substantial similarity, however, summary judgment is improper. *Twentieth Century–Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329–30 (9th Cir.1983) (reversing a grant of summary judgment because reasonable minds could differ as to whether the television series "Battlestar: Galactica" infringed on the motion picture "Star Wars"); *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir.) (same as to the composition "Joy" and the

---

1. These series were "Quincy," "Nancy Drew," "McCloud," "Columbo," "Switch," "Maude," "Six Million Dollar Man," and "Barnaby Jones." Shaw has also been a writer for such television mainstays as "Mission: Impossible," "Ironside," "Love American Style," and "The Munsters."

theme from "E.T."), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

## DISCUSSION

### I. *Copyright Claim*

■■■ Copyright law protects an author's expression; facts and ideas within a work are not protected. *Narell,* 872 F.2d at 910. To establish a successful copyright infringement claim, Shaw must show that he owns the copyright and that defendant copied protected elements of the work. *Id.* Because, in most cases, direct evidence of copying is not available, a plaintiff may establish copying by showing that the infringer had access to the work and that the two works are substantially similar. *Id.* The defendants conceded Shaw's ownership of the original Equalizer script and their access to the script for purposes of the summary judgment motion. As a result, the only issue before the district court on the copyright claim was whether defendants' version of the Equalizer is substantially similar to Shaw's original script.

Any test for substantial similarity is necessarily imprecise:

> "Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may ·perhaps be no more than the most general statement of what the play is about and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended."

*Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1163 (9th Cir.1977) (quoting *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931)). It is thus impossible to articulate a definitive demarcation that measures when the similarity between works involves copying of protected expression; decisions must inevitably be ad hoc. *Id.* at 1164 (citing *Peter Pan Fab-*

*rics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (L. Hand, J.)); *see also Comment, Does Form Follow Function?,* 35 UCLA L.Rev. 723 (1988) (discussing the difficulty of demarcating the idea-expression line).

### A. The Krofft Framework

■■■ The Ninth Circuit employs a two-part test for determining whether one work is substantially similar to another. *Narell,* 872 F.2d at 912; *Olson v. National Broadcasting Co.,* 855 F.2d 1446, 1448 (9th Cir. 1988). Established in *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977), the test permits a finding of infringement only if a plaintiff proves *both* substantial similarity of general ideas under the "extrinsic test" and substantial similarity of the protectable expression of those ideas under the "intrinsic test." *Olson,* 855 F.2d at 1449; *Krofft,* 562 F.2d at 1164.

#### 1. Scope of the *Krofft* Tests

*Krofft* defined the extrinsic test as a "test for similarity of ideas" under which "analytic dissection and expert testimony are appropriate." 562 F.2d at 1164. The intrinsic test, according to *Krofft,* should measure "substantial similarity in expressions ... depending on the response of the ordinary reasonable person.... [I]t does not depend on the type of external criteria and analysis which marks the extrinsic test." *Id.* In decisions under the intrinsic test, "analytic dissection and expert testimony are not appropriate." *Id.*

Relying on this language, panels applying *Krofft* to literary works have included a lengthy list of concrete elements under the extrinsic test. Whereas *Krofft* listed "the type of artwork involved, the materials used, the subject matter, and the setting for the subject" as criteria for consideration under the extrinsic test, *id.,* a series of opinions beginning with the district court opinion in *Jason v. Fonda,* 526 F.Supp. 774 (C.D.Cal.1981), *aff'd and incorporated by reference,* 698 F.2d 966 (9th Cir.1982), have listed "plot, themes, dialogue, mood, setting, pace, and sequence"

as extrinsic test criteria. 526 F.Supp. at 777; *see also Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984) (repeating this list), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985); *Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir.) (same), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985); *Olson,* 855 F.2d at 1450 (same); *Narell,* 872 F.2d at 912 (adding "characters" to the list and transforming "sequence" into "sequence of events").

Now that it includes virtually every element that may be considered concrete in a literary work, the extrinsic test as applied to books, scripts, plays, and motion pictures can no longer be seen as a test for mere similarity of ideas. Because the criteria incorporated into the extrinsic test encompass all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of *expression,* having strayed from *Krofft's* division between expression and ideas. *See Narell,* 872 F.2d at 912 (referring to an *objective,* extrinsic test and a *subjective,* intrinsic test); *Berkic,* 761 F.2d at 1292 (same); *Litchfield,* 736 F.2d at 1356 (same). *But see Olson,* 855 F.2d at 1448–49 (adhering to *Krofft's* idea/expression distinction). Indeed, a judicial determination under the intrinsic test is now virtually devoid of analysis, for the intrinsic test has become a mere subjective judgment as to whether two literary works are or are not similar. *See Berkic,* 761 F.2d at 1294 (reaching a result under the intrinsic test in one paragraph); *Olson,* 855 F.2d at 1453 (same).

### 2. The District Court's Application of *Krofft*

An example of how the absence of legal analysis may frustrate appellate review of the intrinsic test is the district court's order in this matter. The district court found, after extensive analysis, that reasonable minds might conclude that plaintiffs' and defendants' works were substantially similar as to the objective characteristics of theme, plot, sequence of events, characters, dialogue, setting, mood, and pace. Nevertheless, the court made a subjective determination under the intrinsic test that *no* reasonable juror could determine that the works had a substantially similar total concept and feel. The district court order reads in part:

2. *Application of the Extrinsic Test*

Under the first part of *Krofft's* two-part test, the plaintiff must prove that the general ideas in both the plaintiffs' and defendants' works are substantially similar....

....

a. Theme

The theme of both works revolves around the main character, the Equalizer,—"a man who will equalize the odds, a lone man working outside the system to protect his underdog clients and to resolve their predicaments as a part of his rough notion of justice." ... Beyond the defendants' superficial evaluation of the themes of both works, one discovers some similarity. For example, plaintiffs' lead character describes his job as "the greatest thing a man could do with his life ... [that is] help give somebody an even shot, shake up the odds a little;" while defendants' lead character tells a client that his job is to "Equalize the odds. Put the odds in your favor."

b. Plot

A comparison of the plots of both works reveals significant similarities and differences. For example, both works involve a cover up/blackmail conspiracy and a woman who is in jeopardy, however, in defendants' work the main character takes on two cases whereas plaintiffs' Equalizer has only one client. A review of plaintiffs' expert's analysis reveals substantial similarities between the respective works, yet, as defendants point out many of these comparisons are taken out of order or context. For example, both works involve a criminal organization that blackmails a public official. The defendants' Equalizer, however, involves a tight blackmail ring, operated out of the corporate headquarters of a telecommunication company in New York city, whereas plaintiffs' criminal organization is described as a Mafia that con-

trols the Boyle Heights Chicano Community of Los Angeles.

Despite these dissimilarities, the respective plots do parallel each other. Dr. Seger's declaration illustrates how the plots in both scripts share a common sequence and rhythm. *See* Seger Dec. at p. 51.

### c. Characters and Dialogue

Both parties' scripts have similar lead characters. In defendants' story, McCall, the former spy turned Equalizer is motivated by past wrongs and seems intent on helping any underprivileged person who faces insurmountable odds. Plaintiffs' lead character, Jericho, also seeks to prevent injustice, however, as defendants point out his motivations are often unclear. Both leads are well educated, wealthy and have expensive tastes. The most striking similarity between the McCall and Jericho is their self-assuredness, and unshakable faith in the satisfactory outcome of any difficult situation.

Although certain characters (such as Erica in plaintiffs' script) are not duplicated in defendants' work, their absence is not of major significance when considering both stories in their entirety. Instead many of defendants' characters share similar traits with plaintiffs' characters. Examples include the clients, Tracy Rollins and Colleen Randall; the candidates, Kale and Blanding; the cover up villains, Rivera and Morgan; the former colleagues/inside contacts, Fleming and Brahms. Such a parallel may go unnoticed, however, when considering the overall format of each work.

The dialogue in the respective works do share some striking similarities. Plaintiffs' expert has set forth, side-by-side, dialogue from a variety of characters which almost match. *See* Seger Dec. at 60.

Utilizing the extrinsic test adopted in *Krofft* it appears that reasonable minds might differ as to the substantial similarity between the protected *ideas* of the respective works.

### 3. Application of the Intrinsic Test

The second step of the *Krofft* analysis requires the trier of fact to decide whether there is substantial similarity in the expression of the ideas so as to constitute copyright infringement. *Krofft*, 562 F.2d at 1164. This second step is called the intrinsic or audience test, because it depends on the response of the ordinary reasonable person. *Id.* The Court must determine whether reasonable minds can differ as to whether defendants' Equalizer captured the total "concept and feel" of plaintiffs' scripts....

... Reasonable minds could not differ as to whether the total concept and feel of the respective Equalizer works is substantially similar [under the intrinsic test]. Although general similarities between the works exist, plaintiffs have failed to establish that enough protected *expression* is infringed to warrant denial of defendants' Motion for Summary Judgment.

The district court's decision to grant summary judgment solely on a subjective assessment under *Krofft's* intrinsic test conflicts with the prescriptions of *Krofft.* In *Krofft*, this court stated that the outcome of the extrinsic test "may often be decided as a matter of law." 562 F.2d at 1164. In contrast, "[i]f there is substantial similarity in ideas, then *the trier of fact* must decide [under the intrinsic test] whether there is substantial similarity in the expressions of the ideas so as to constitute infringement." *Id.* (emphasis added); *see also id.* at 1166 ("[T]he intrinsic test for expression is uniquely suited for determination by *the trier of fact.*" (emphasis added)). Professor Nimmer has also noted that "the second step in the [*Krofft*] analytic process requires that *the trier of fact* then decide 'whether there is substantial similarity in the expressions of the ideas so as to constitute infringement.'" 3 M. Nimmer, *Nimmer on Copyright* § 13.03[E][3], at 62.14 (1989) [hereinafter *Nimmer on Copyright*].

### 3. *Krofft* and the Summary Judgment Standard

■ The test for summary judgment in a copyright case must comport with the stan-

dard applied to all civil actions. The Supreme Court recently explained the standard for granting a summary judgment in *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (quoting Fed.R.Civ.P. 56(c)). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. The Court in *Celotex* elaborated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322–23, 106 S.Ct. at 2552–53.

▇▇ We must determine in this matter whether a party that demonstrates a triable issue of fact under the extrinsic test has made a sufficient showing of substantial similarity to defeat a summary judgment motion. As noted above, the extrinsic test focuses on "specific similarities between the plot, theme, dialogue, mood, setting, pace, characters, and sequence of events.... 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Narell,* 872 F.2d at 912 (quoting *Berkic,* 761 F.2d at 1293). These are the measurable, objective elements that constitute a literary work's expression. Because these elements are embodied in the extrinsic test, we hold that it is improper for a court to find, as the district court did, that there is no substantial similarity as a matter of law after a writer has satisfied the extrinsic test. To conclude otherwise would allow a court to base a grant of summary judgment on a purely subjective determination of similarity. This result would conflict with the Court's instruction in *Anderson,* that "at the summary judgment stage, the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249, 106 S.Ct. at 2510.

The rule we announce today—that satisfaction of the extrinsic test creates a triable issue of fact in a copyright action involving a literary work—is in harmony with our prior decisions. Although various panels of this circuit have affirmed grants of summary judgment on the issue of substantial similarity between books, scripts, films, or plays, none of these decisions have rested on application of the intrinsic test alone. *See Narell,* 872 F.2d at 912–13 (failure to satisfy both tests); *Olson,* 855 F.2d at 1450–53 (same); *Berkic,* 761 F.2d at 1293–94 (same); *Litchfield,* 736 F.2d at 1356–57 (same); *See v. Durang,* 711 F.2d 141, 143 (9th Cir.1983) (per curiam) (not specifying either test, but engaging in the dissection and analysis appropriate under the extrinsic test); *Jason v. Fonda,* 698 F.2d 966 (9th Cir.1982) (incorporating by reference *Jason v. Fonda,* 526 F.Supp. 774, 777 (C.D.Cal.1981)) (failure to satisfy both tests).

Defendants point to *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901–02 (9th Cir.1987), and *Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204 (9th Cir.1988), as cases in which we have indicated that it is proper for a court to engage in a subjective assessment

of substantial similarity in ruling on a motion for summary judgment. In *Aliotti*, we affirmed a grant of summary judgment based upon our conclusion that the stuffed dinosaur toys produced by the defendant were not substantially similar to the plaintiff's product under a "total concept and feel" standard. 831 F.2d at 902. Similarly, in *Data East* we concluded that "a discerning 17.5 year-old boy could not regard [two karate video games] as substantially similar." 862 F.2d at 209–10 (footnote omitted).

Both *Aliotti* and *Data East* relied on the principle that " '[n]o substantial similarity of expression will be found when "the idea and its expression are ... inseparable," given that "protecting the expression in such circumstances would confer a monopoly of the *idea* upon the copyright owner." ' " *Data East*, 862 F.2d at 208 (quoting *Aliotti*, 831 F.2d at 901 (quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971))) (emphasis in *Data East*). Thus, both cases should be read as involving a union of idea and expression. *See Kalpakian*, 446 F.2d at 742 ("[O]n this record the 'idea' and its 'expression' appear to be indistinguishable."). Where idea and expression are unified, extending copyright protection to the objective elements of expression would grant the copyright holder a monopoly over the ideas expressed in the works, in violation of 17 U.S.C. § 102(b). *See Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir.1967) (where the topic permits only a limited amount of expression, "the subject matter would be appropriated by permitting the copyrighting of its expression") (discussing rules for a sweepstake contest involving social security numbers).

By creating a discrete set of standards for determining the objective similarity of literary works, the law of this circuit has implicitly recognized the distinction between situations in which idea and expression merge in representational objects and those in which the idea is distinct from the written expression of a concept by a poet, a playwright, or a writer. A high degree of similarity is "inevitable from the use of

[the] jewel-encrusted bee forms" at issue in *Kalpakian*, 446 F.2d at 742, or the stuffed dinosaur forms at issue in *Aliotti*, or the karate video games in *Data East*. As a result, the scope of the copyright protection afforded such works is necessarily narrow. *See id.* ("A jeweled bee pin is ... an 'idea' that defendants were free to copy."). In contrast, there is an infinite variety of novel or creative expression available to the author of a book, script, play, or motion picture based on a preexisting idea.

Given the variety of possible expression and the objective criteria available under the extrinsic test to analyze a literary work's expression, as distinct from the ideas embodied in it, the intrinsic test cannot be the sole basis for a grant of summary judgment. Once a court has established that a triable question of objective similarity of expression exists, by analysis of each element of the extrinsic test, its inquiry should proceed no further. What remains is a subjective assessment of the "concept and feel" of two works of literature—a task no more suitable for a judge than for a jury. This subjective assessment is not a legal conclusion; rather it involves the audience in an interactive process with the author of the work in question, and calls on us "to transfer from our inward nature a human interest and a semblance of truth sufficient to procure for these shadows of imagination that willing suspension of disbelief for the moment, which constitutes poetic faith." S.T. Coleridge, *Biographia Literaria*, ch. 14, *reprinted in 5 English Literature: The Romantic Period* (A. Reed ed. 1929). This interactive assessment is by nature an individualized one that will provoke a varied response in each juror, for what "makes the unskillful laugh, cannot but make the judicious grieve." W. Shakespeare, *Hamlet*, Act III, scene ii, ll. 27–28. It is not the district court's role, in ruling on a motion for a summary judgment, to limit the interpretive judgment of each work to that produced by its own experience.

A determination that a bee fashioned by a jeweler, or a stuffed animal produced by a toymaker, embodies an idea—the form of

a natural creature—that cannot be separated from its expression, primarily involves the observer's physical senses. Where idea and expression merge, a court is well-suited to make the required determination of similarity on a motion for summary judgment. A comparison of literary works, on the other hand, generally requires the reader or viewer to engage in a two-step process. The first step involves the objective comparison of concrete similarities; the second employs the subjective process of comprehension, reasoning, and understanding. The imagery presented in a literary work may also engage the imagination of the audience and evoke an emotional response. Because each of us differs, to some degree, in our capability to reason, imagine, and react emotionally, subjective comparisons of literary works that are objectively similar in their expression of ideas must be left to the trier of fact.

For these reasons, a showing of substantial similarity with reference to the eight objective components of expression in the extrinsic test applied to literary works creates a genuine issue for trial. If a district court concludes, after analyzing the objective criteria under the extrinsic test, that reasonable minds might differ as to whether there is substantial similarity between the protected expression of ideas in two literary works, and the record supports the district court's conclusion, there is a triable issue of fact that precludes summary judgment. This rule is necessary because our expansion of the extrinsic test as applied to literary works has incorporated all objective elements of expression, leaving a mere subjective assessment of similarity for the intrinsic test. Because such an assessment may not properly be made as a matter of law, it is for the trier of fact to determine whether the intrinsic test is satisfied.[2] Accordingly, our decision in this matter turns on whether Shaw has raised a triable issue of fact under *Krofft's* extrinsic test.

**2.** This is not to say that summary judgment on the issue of *expression* is never proper. *See See v. Durang,* 711 F.2d 141, 143 (9th Cir.1983) ("[Krofft] does not hold that the summary judgment is always inappropriate on the issue of substantial similarity of expression if there is a substantial similarity of ideas. Plaintiff offers

**B.. The Extrinsic Test**

**1. Role of Access**

■ Although access was not an issue before the district court for purposes of the defendants' summary judgment motion, we must consider defendants' access to Shaw's script in determining substantial similarity. The holding in *Krofft* itself rested in part on a finding that the defendants' "degree of access justifies a lower standard of proof to show substantial similarity." 562 F.2d at 1172. As we stated in *Krofft:*

> No amount of proof of access will suffice to show copying if there are no similarities. This is not to say, however, that where clear and convincing evidence of access is presented, the quantum of proof required to show substantial similarity may not be lower than when access is shown merely by a preponderance of the evidence. As Professor Nimmer has observed:
>
> > "[C]lear and convincing evidence of access will not avoid the necessity of also proving substantial similarity since access without similarity cannot create an inference of copying. However this so-called 'Inverse Ratio Rule' ... would seem to have some limited validity. That is, since a very high degree of similarity is required in order to dispense with proof of access, it must logically follow that *where proof of access is offered, the required degree of similarity may be somewhat less* than would be necessary in the absence of such proof."

*Id.* (quoting 2 M. Nimmer, *Nimmer on Copyright* § 143.4, at 634 (1976) (citations omitted)) (emphasis added). *But see Aliotti,* 831 F.2d at 902 (questioning, in dictum, the "continuing viability of Professor Nimmer's proposal"). Because no subsequent decision has disturbed the access rule es-

neither authority nor reason supporting such a *per se* rule."). When a plaintiff demonstrates an issue of fact as to the objective components of expression now embodied in the extrinsic test, however, it is improper to grant summary judgment based on a subjective assessment under the intrinsic test alone.

tablished in *Krofft*, we believe that it is the law of this circuit. Thus, defendants' admission that they had access to Shaw's script is a factor to be considered in favor of Shaw.

### 2. Effect of Identical Title on Substantial Similarity

The fact that the two works have identical titles also weighs in Shaw's favor. In *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946), the Second Circuit held that "[a] title cannot be copyrighted." *Id.* at 474. This is true in the sense that titles, in and of themselves, cannot claim statutory copyright. 1 M. Nimmer, *Nimmer on Copyright*, § 2.16, at 2–186 (1989). Nevertheless, "[i]f the copying of a title is not an act of copyright infringement, it may ... have copyright significance as one factor in establishing whether the substance of plaintiff's work (not the title) has been copied." *Id.* at 2–188. As the Seventh Circuit has stated, "the title of a copyrighted work should be taken into account when the same title is applied to a work [allegedly] copied from it." *Wihtol v. Wells*, 231 F.2d 550, 553 (7th Cir.1956); *see also Robert Stigwood Group, Ltd. v. Sperber*, 457 F.2d 50, 55 (2d Cir.1972) ("[T]he admitted desire of defendants to make reference to [the title 'Jesus Christ Superstar'] in its advertisement provides further evidence that the performance is intended to come as close as possible to the original dramatic co-musical."). Thus, we acknowledge and consider defendants' admitted copying of Shaw's title in determining whether there is substantial similarity of protected expression between the two works.

### 3. The Extrinsic Test Applied

As noted earlier, a court applying the extrinsic test must compare "the individual features of the works to find specific similarities between the plot, theme, dialogue, mood, setting, pace, characters, and sequence of events." *Narell*, 872 F.2d at 912; *Berkic*, 761 F.2d at 1292. "The test focuses not on basic plot ideas, which are not protected by copyright, but on 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Narell*, 872 F.2d at 912 (quoting *Berkic*, 761 F.2d at 1293). Our study of the two scripts at issue reveals the following objective similarities in protected expression under the extrinsic test:

### a) Theme

As the district court noted, the theme of both works revolves around the character of the Equalizer—"a man who will equalize the odds, a lone man working outside the system." This, in itself, is but an unprotectible idea—the same could be said of literary characters from Aladdin to Zorro. Yet the similarity in theme extends beyond this basic idea—the Equalizer in each script solicits clients requiring assistance that conventional law enforcement cannot offer, and each lead character describes his role as to "equalize" or "shake up" the odds. Defendants point to differences in their pilot, contending that their Equalizer is motivated by his dissatisfaction with prior covert government employment and his desire to renew his relationship with his estranged wife and son. These themes, although different, are secondary and do little to erode the similarity between the central themes embodied in the titles of the two works. " 'No plagiarist can excuse the wrong by showing how much of his work he did not pirate.' " *Nimmer on Copyright* § 13.03[B][1][a], at 13–48 to 13–49 (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936)). The similarity in themes in the two works before the court extends to elements of protectable expression.

### b) Plot/Sequence of Events

Shaw provides a list of "26 strikingly similar events" that he claims appear in both works in substantially the same sequence. Examination of this list after a reading of both scripts, however, reveals that it is, for the most part, a compilation of "random similarities scattered throughout the works" that this court discounted in *Litchfield*. 736 F.2d at 1356. Shaw's list misrepresents the order and similarity

of many of these events, and relies heavily on "scenes à faire"—that is, scenes that flow naturally from a basic plot premise. *Berkic*, 761 F.2d at 1293. Indeed, defendants provide a list of similarities between "The Wizard of Oz" and "Star Wars" that is virtually as compelling as Shaw's.

Shaw's overexuberance, however, does not change the fact that many of the events in the two works are substantially similar. Both works involve a criminal organization that blackmails a candidate for public office. Both organizations attempt to kill a prospective Equalizer client, who has discovered their operation, by means of an oncoming truck. In both scripts, henchmen for the criminal organization interrupt the Equalizer's initial meeting with the client, chase and shoot at the Equalizer and the client, and are foiled as the Equalizer saves the client. In both scripts, the uninvited Equalizer appears at a party in a tuxedo. In both, the Equalizer confronts the candidate/blackmail victim after a campaign speech. After thwarting the leader of the criminal conspiracy, the Equalizer rushes to save a female client from danger. The Equalizer's actions in both scripts result in the candidate/blackmail victim's withdrawal from the political race.

Even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression. As the district court noted, "the respective plots parallel each other. . . . [T]he plots in both scripts share a common sequence and rhythm." "Where plot is ... properly defined as 'the "sequence of events" by which the author expresses his "theme" or "idea,"'' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff's and defendant's works." *Nimmer on Copyright* § 1303[A], at 13–31 (quoting *Shipman v. RKO Radio Pictures, Inc.*, 100 F.2d 533, 537 (2d Cir.1938)).

#### c) Mood, Setting and Pace

Both works are fast-paced, have ominous and cynical moods that are lightened by the Equalizer's victory, and are set in large cities. These similarities are common to any action adventure series, however, and do not weigh heavily in our decision.

#### d) Characters and Dialogue

As the district court noted, both the dialogue and the characters in the respective works share some striking similarities. A particularly glaring example of similar personal traits is revealed by a comparison of the principal characters in both works. As the district court found, both scripts have "similar lead characters. . . . Both leads are well dressed, wealthy and have expensive tastes. The most striking similarity is their self-assuredness, and unshakeable faith in the satisfactory outcome of any difficult situation." Although James Bond may have the Equalizers' demeanor and the Ghostbusters may have their penchant for unpopular assignments, the totality of the similarities between the two characters goes beyond the necessities of the "Equalizer" theme and belies any claim of literary accident. We find that defendants' copying of the Equalizer character and other characters extends to elements of protected expression. Because the similarities between the principals in each script and among the other common characters point to copying of more than a general theme or plot idea, they support the district court's finding that Shaw raised a triable issue of fact regarding substantial similarity under the extrinsic test.

#### 4. Conclusion

We conclude that Shaw has satisfied the extrinsic test for literary works and thus has presented a triable issue of fact regarding substantial similarity of protected expression. "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter*, 812 F.2d at 425. A reasonable trier of fact could find that the similarity between Shaw's script and defendants' pilot is not so general as to be beyond the protections of copyright law. Be-

cause Shaw has produced a triable issue of fact under the extrinsic test, we reverse the district court's grant of summary judgment on Shaw's copyright claim.

## II. *Lanham Act Claim*

■ The district court also granted summary judgment on Shaw's claim that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a) makes a person liable for using a false description of origin in connection with any goods or services put into commerce. 15 U.S.C. § 1125(a) (1988); *Litchfield,* 736 F.2d at 1357.

The district court based its dismissal of Shaw's Lanham Act claim on its finding that there is no substantial similarity between Shaw's script and defendants' pilot. *See Litchfield,* 736 F.2d at 1358 ("[W]ithout substantial similarity there can be no claim for reverse passing off under section 43(a)."); *accord Berkic,* 761 F.2d at 1291 n. 1. Because we reverse the district court's finding that there is no substantial similarity between the two works as a matter of law, we must decide whether a situation such as that presented here is an appropriate basis for a Lanham Act claim.

The Lanham Act explicitly condemns false designations or representations in connection with any goods or services. *Smith v. Montoro,* 648 F.2d 602, 605 (9th Cir.1981). Section 43(a) of the Lanham Act provides:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of such false description or representation.

15 U.S.C. § 1125(a) (1988). Shaw interprets the "false designation of origin" language to include instances in which a defendant has copied a product and committed "reverse passing off" by selling it under his own label. He relies on *Smith,* which held that an actor may state a claim under § 43(a) when his name is replaced with another's in a motion picture's credits.

Although this court has twice specifically reserved the question whether "reverse passing off" claims may be recognized in situations where works are substantially similar, *Litchfield,* 736 F.2d at 1358; *Kamar Int'l Inc. v. Russ Berrie & Co.,* 657 F.2d 1059, 1064 (9th Cir.1981), *Smith* and *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403 (9th Cir.1988), have implicitly limited the "reverse passing off" doctrine to situations of bodily appropriation. *Smith* defined "reverse passing off" as removing or obliterating the original trademark without authorization before reselling goods produced by someone else. 648 F.2d at 605. *Smith* limited reverse passing off to two situations: "Reverse passing off is accomplished 'expressly' when the wrongdoer removes the name or trademark on another party's product and sells *that product* under a name chosen by the wrongdoer. 'Implied' reverse passing off occurs when the wrongdoer simply removes or otherwise obliterates the name of the manufacturer or source and sells *the product* in an unbranded state." *Id.* (emphasis added). *Lamothe* also defined reverse passing off as limited to these two situations, 847 F.2d at 1406, and neither case indicated that § 43(a) is applicable where the products at issue are merely substantially similar.

We are reluctant to expand the scope of § 43(a) to cover the situation presented here. Shaw's claim is not consistent with the Lanham Act's purpose of preventing individuals from misleading the public by placing their competitors' work forward as their own. In spite of the similarities between Shaw's script and defendants' pilot, the likelihood that the two works will be confused is minimal. We decline to expand the scope of the Lanham Act to cover cases

in which the Federal Copyright Act provides an adequate remedy. Therefore, we affirm the district court's dismissal of Shaw's Lanham Act claim.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.