**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FUNKY FILMS, INC., a California
corporation; GWEN O'DONNELL,
   *Plaintiffs-Appellants,*

v.

TIME WARNER ENTERTAINMENT
COMPANY, L.P., a Delaware limited
partnership; HOME BOX OFFICE, a
division of Time Warner
Entertainment Company, L.P.,
   *Defendants-Appellees.*

No. 04-55578

D.C. No.
CV-03-00964-CJC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
February 13, 2006—Pasadena, California

Filed August 30, 2006

Before: Betty B. Fletcher, Warren J. Ferguson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge B. Fletcher

10441

## COUNSEL

Robert F. Helfing (argued), Los Angeles, California, and Rex T. Reeves, Newport Beach, California, for the appellants.

Jeffrey A. Conciatori (argued), Margret Caruso, New York, New York, and Christopher Tayback, Los Angeles, California, for the appellees.

## OPINION

B. FLETCHER, Circuit Judge:

Gwen O'Donnell and Funky Films, Inc. (collectively, "appellants"), creators of the screenplay "The Funk Parlor," appeal the district court's summary judgment to Time Warner Entertainment Company and Home Box Office (collectively, "HBO"), creators of the award-winning television mini-series "Six Feet Under," for copyright infringement. Appellants assert that the district court erred in concluding that "The Funk Parlor" and "Six Feet Under" are not substantially similar. They also appeal the district court's denial of a request for additional discovery. For the reasons set forth below, we affirm the judgment of the district court.

# I

Between October 1997 and July 1999, Gwen O'Donnell drafted "The Funk Parlor," a screenplay tracing the lives of a small, family-run funeral parlor in Connecticut. Sometime in 1998, O'Donnell was injured in an automobile accident and sought treatment from Stacey Smith, a chiropractor. During these appointments, the two discussed O'Donnell's screenplay; eventually, Smith took an interest in the script and asked O'Donnell if she would like him to give a copy to his friend and client Chris Albrecht, the President of Original Programing at HBO. O'Donnell agreed and gave Smith a copy of "The Funk Parlor." Three months later, Carolyn Strauss, Albrecht's top lieutenant, solicited Alan Ball to develop "Six Feet Under" for HBO.[1]

Appellants allege that "The Funk Parlor" and "Six Feet Under" are substantially similar and that HBO unlawfully infringed upon appellants' copyrighted work. "As a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (internal citation and quotation marks omitted), we begin with a discussion of the works at issue.

# A

"The Funk Parlor" takes place in a small, family-run funeral home in Connecticut. John Funk Sr., the patriarch, has committed suicide, and the deteriorating funeral parlor has been handed down to his two sons, John Jr. and Tom. John, the older brother who had moved away to start his own business promoting nightclubs in Los Angeles, reluctantly decides to remain in Connecticut after his father's death to help out

---

[1]In the district court, appellees submitted declarations in support of their claim that they never had access to "The Funk Parlor." That issue is not before us, because the district court assumed access for purposes of summary judgment.

with the struggling venture. Applying his business acumen, John revives it, all the while staving off an attempted takeover by a larger competitor. Meanwhile, he attracts the attention of Sophie, a neighbor and longtime acquaintance, and the two become romantically involved. Sophie repeatedly talks of entering a convent to become a nun, although in actuality she is a psychopathic murderer whose killing sprees breathe new life (as it were) into the Funk business. John and Sophie intend to marry, but John eventually figures out that he is Sophie's next target and that he must kill her (which he does) to spare his own life.

Tom, who had been running the funeral home during John's absence and who expresses an interest in Sophie as well, is murdered midway through the play. After Tom's death, John continues operating the business to bring it out of debt. After Sophie's death, John sells the business, moves to New York, and returns to the nightclub business.

Like "The Funk Parlor," "Six Feet Under" takes place in a funeral home and begins with the death of the patriarch, Nathaniel Fisher, and return of the "prodigal son," Nate, who receives an equal share of the business along with his younger brother, David. Nate decides to stay and help David maintain the business, which, like the Funk business, struggles against a larger competitor. The story traces the interpersonal relationships and romantic lives of each of the Fisher sons. It also revolves around the lives of the mother, Ruth, and sister, Claire, as well as other characters who come into contact with members of the Fisher family. The father, though deceased, reemerges throughout the drama. He continues to interact with each remaining character of the Fisher family, often helping them piece together problems that seemed irresolvable during his lifetime.

At the beginning of the drama, Nate begins a relationship with Brenda Chenowith, a massage therapist he meets on an airplane. David, who is gay, struggles with his sexuality and

begins a relationship with Keith, a police officer he meets at church.

## B

The district court conducted an independent analysis of the "The Funk Parlor" and the first three episodes of "Six Feet Under," comparing the two works for their setting, plot, characters, theme, mood, pace, dialogue, and sequence of events. The court determined that the works' few similarities operate at a general, abstract level and that no jury could reasonably find substantial similarities between the two works. Accordingly, the court granted HBO's motion for summary judgment.[2] Appellants filed a timely notice of appeal.

## II

We review the district court's grant of summary judgment de novo, *see Government of Guam v. United States*, 179 F.3d 630, 632 (9th Cir. 1999), viewing the evidence in the light most favorable to the non-moving party to determine the presence of any issues of material fact. *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 (9th Cir. 1994). Summary judgment is appropriate only when "there is no genuine issue as to any material fact," *see* Fed. R. Civ. P. 56(c), and only if "the evidence . . . is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## A

**[1]** A plaintiff bringing a claim for copyright infringement must demonstrate "(1) ownership of a valid copyright, and (2)

---

[2]Appellants also alleged violations of statutory and common law, unfair competition laws and the Lanham Act. The district court granted HBO's motion to dismiss those claims, and Funky Films does not press them on appeal.

copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Appellants' ownership in the copyright is undisputed; they need only demonstrate a triable issue of fact whether HBO "cop[ied] anything that was 'original' to" their work. *Id.* Absent evidence of direct copying, "proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.' " *See, e.g., Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). Because the district court assumed, without deciding, appellees' access to "The Funk Parlor," we must decide whether the two works are substantially similar.

[2] "When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression." *Kouf*, 16 F.3d at 1045 (internal citations and punctuation omitted). Although "summary judgment is not highly favored on the substantial similarity issue in copyright cases," *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985), substantial similarity "may often be decided as a matter of law." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). Indeed, "[w]e have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990). *See Berkic*, 761 F.2d at 1292 ("we have frequently affirmed summary judgments in favor of copyright defendants on the substantial similarity issue") (citing cases); *see also Kouf*, 16 F.3d at 1045-1046 (finding no substantial similarity as a matter of law).

**B**

[3] The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordi-

nary person's subjective impressions of the similarities between two works, is exclusively the province of the jury. *See Shaw*, 919 F.2d at 1360-61. A "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045.

**[4]** Extrinsic analysis is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d at 1164. The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Kouf*, 16 F.3d at 1045 (citations omitted). In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293.

**[5]** "[P]rotectable expression includes the specific details of an author's rendering of ideas." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). However, *scenes à faire*, which flow naturally from generic plot-lines, are not protectable. *See id.* We " 'must take care to inquire only whether 'the *protectable elements, standing alone*, are substantially similar.' " *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Williams*, 84 F.3d at 599 (emphasis in original)). In so doing, we "filter out and disregard the non-protectable elements in making [our] substantial similarity determination." *Id*.

## C

Appellants allege a number of similarities between "The Funk Parlor" and "Six Feet Under." According to appellants, both works concern "a narrative about a small funeral home, and the lives of the family members who operate it"; plot-

lines involving "the death of the father . . . [who] has for decades run the business"; a father whose death is "unexpected and not attributable to natural causes" (suicide in "The Funk Parlor" and a car accident in "Six Feet Under"); and the presence of "two sons" who receive equal shares of the business, with the "older son . . . liv[ing] in a distant city, working outside the funeral industry." In both works, the older son initially "has no interest in becoming involved with the funeral business"; moreover, "[t]he family business is financially fragile, and in both works the funeral home is pointedly shown to be in debt and operating out of a substandard facility with obsolete equipment and a hearse that stalls." Both works also contain an attempt by a "rival funeral home," spearheaded by "the female principal of the rival business" to "take[ ] advantage of their vulnerable financial condition," "bluntly mak[ing] a lowball offer" and "approaching one of the brothers at the father's funeral with a proposal to buy the family business." In both works, the older brother initially "expresses his desire to sell" but "changes his mind and commits himself to help his brother keep the business afloat." Finally, appellants point out the older brother's creativity, which stands in "pointed contrast to the leaden conservatism of the younger brother"; that the funeral home in both works is used as a "site for musical entertainment"; that the "younger brother . . . change[s] his church affiliation in order to increase their client base" in both works; and that "the rival's takeover attempt does not succeed."

## D

At first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood, pace, dialogue, or sequence of events.

### 1.  *Plot*

[6] Both "Six Feet Under" and "The Funk Parlor" commence with the death of the father and return of the "prodigal

son." Aside from that rather uneventful similarity, the plots of the two stories develop quite differently. The father's suicide in "The Funk Parlor" sets the stage for a series of additional murders, including several of the central characters in the play. The story revolves around the life of the older brother, John, who rehabilitates the fledgling business, falls in love with Sophie, proposes to her and then, upon discovering that she is a serial murderer, kills her in an effort to spare his own life.

**[7]** "Six Feet Under," unlike "The Funk Parlor," is not a murder mystery, nor does it revolve around any plot-line in particular. Rather, "Six Feet Under" explores the intimate lives of each member of the Fisher family by examining each character's complex psyche and his or her interpersonal inter-actions and emotional attachments. "Six Feet Under" devel-ops separate plot-lines around each member of the Fisher family, including the mother and daughter, for whom there are no comparable characters in "The Funk Parlor." "Six Feet Under" is not so much a story about *death* as it is about the way the characters struggle with *life* in the wake of the cata-clysmic death of the father.[3]

2. *Characters*

Although appellants attempt to link up the various charac-ters of the two works, there are very few real similarities between any of them. John Funk, Sr., is a minor character who vanishes at the start of "The Funk Parlor" and does not reappear except during one quick flashback scene; his rela-tionships with the other characters are not consciously

---

[3]"The Funk Parlor" contains a number of scenes with no equivalent in "Six Feet Under" — a surgical blood-transfusion procedure that John exe-cutes at the funeral parlor; a discussion regarding the extraction of ejacula-tory material from a corpse; and numerous scenes involving group-drinking, a techno-rave party that generates money for the ailing funeral home, and recurring references to the band *Led Zeppelin*.

explored. Nathaniel Fisher, Sr., by contrast, appears throughout the drama and continues to interact with each character separately. In that regard, "Six Feet Under" traces each character's unique set of relationships with the deceased father, exploring issues that were apparently not resolvable during life.

[8] The "prodigal son" characters of the two works, while similar at the abstract level, are markedly different in the two scripts. Nate Fisher's search for meaning originally led him away from the family business; prior to his return home, he remained somewhat adrift in Seattle. Although he reluctantly agrees to remain in Los Angeles to help his brother David run the business, he shows little interest or skill. John Funk, Jr., by contrast, is a talented and creative businessperson whose efforts quickly restore the moribund business. Unlike Nate, John graduated from mortuary school and took on an active role in the business before decamping for Los Angeles to become a club promoter.

[9] The characters of David Fisher and Tom Funk, both younger brothers, are remarkably different. Tom's role in "The Funk Parlor" is less developed (in part because he is killed roughly midway through the story), though he is clearly less skilled than his brother at maintaining the family business. Although Tom is rumored to be gay, his homosexuality remains a matter of speculation and is never pursued through any relationship or meaningful dialogue. David, by contrast, is deeply enmeshed in a struggle with sexual identity, which he hides from his family and explores privately. His coming-out process and his relationship with Keith occupy a central plot-line of the story. The complexity of David's character has no equivalent in "The Funk Parlor."

Appellants equate Sophie Zemlaskas with Brenda Chenowith, both of whom are romantically involved with the older brother in each story. However, the two have little in common. Sophie, a devout and obsessive Catholic who plans

to enter the convent, is a psychopathic killer. Unlike Sophie, Brenda is not homicidal. Brenda, a massage therapist, is psychologically astute and expresses no interest in religion. While Sophie expresses deep conflict over her sexuality, Brenda engages in an apparently conflict-free sexual life with Nate (and others).

Appellants also try to draw connections between Jamie, a twelve- or thirteen-year-old cousin who works at the funeral home, and Claire Fisher, the younger sister in "Six Feet Under." But Jamie is a very minor character; Claire, by contrast, is a central character who develops relationships of her own. Her struggle to define herself within the family, while rejecting any place within the family business, is a recurring theme in "Six Feet Under."

**[10]** Completely missing from "The Funk Parlor" is any character similar to Ruth Fisher, the mother and one of the central characters of "Six Feet Under." Ruth is presented as a strong-willed woman who struggles to overcome her lingering maternal instincts over her now-grown children. Her own romantic attachments and relationships form an important part of the plot-line as well.

**[11]** Additional characters within "Six Feet Under" that have no counterpart in "The Funk Parlor" are Fredrico Diaz, an employee of the Fisher business who eventually becomes a partner, and Keith Charles, David's boyfriend who struggles to remain in the relationship despite David's conflicts in coming to terms with his sexuality.

### 3.  *Themes*

**[12]** Although both works explore themes of death, relationships, and sex, they do so in very different ways. "The Funk Parlor," a murder mystery, is driven by a series of murders, which catalyze the salvation of the business. The use of death in "Six Feet Under" is quite different: there, death pro-

vides the focal point for exploring relationships and existential meaning. As noted by the district court, the general theme of "Six Feet Under" "is that sex and death provide focal points for relationships," while the predominant theme of "The Funk Parlor" is that "sex and religion don't mix."

In addition to the numerous murders that take place, "The Funk Parlor" traces a number of religious themes (tension between members of the Protestant and Catholic communities, religious conversion, and a general fear of God). Much of the story takes place at the Polish deli owned by Sophie's family, and several of the deaths take place at "Overlook Point." Characters continually brush up against law-enforcement officials investigating the series of murders. Meanwhile, the religious themes serve as a conscious moral structure against the backdrop of the mass killings that take place. The characters must come to grips with religious expectations, agonizing that they will "burn in Hell" and that "God is punishing us." John Funk considers religious conversion and seeks confession as a source of absolution. Sophie, meanwhile, is obsessed with religion and, for much of the story, appears ready to enter the convent to become a nun.

"Six Feet Under," by contrast, is a neo-realistic, postmodern account of family and romantic relationships, without any overarching religious themes or overtones. Themes of love, romance, death, and sexuality are explored entirely through the characters' complex interactions. The story focuses on the characters' longing for connection, their insecurities, and their complaints. Unlike "The Funk Parlor," none of the main characters are murderers or murder victims.

4.  *Setting, Mood, and Pace*

[13] Although both works take place in a contemporary, family-run funeral home, the similarities in setting end there. "Six Feet Under" takes place in a well-maintained funeral home in Los Angeles. Although the business struggles against

a competitor and is, at times, somewhat sluggish, "The Funk Parlor, located in Connecticut, is in shambles. The moods of the two works are drastically different as well. "The Funk Parlor" is a farcical mystery, while "Six Feet Under" is serious, dramatic, and introspective. "The Funk Parlor" moves at a rapid clip, while "Six Feet Under" evolves slowly and often in repetitive fashion. Beyond the basic premise of a family-run funeral home, there are no similarities in the setting, mood or pace of the two works.

### 5.  *Dialogue*

**[14]** The encounters explored in "The Funk Parlor" are at times pedestrian, and the dialogue, at times, rather trite. The characters play beer-drinking games like "I never" and express concern about "burning in hell" and that "God is punishing us." "Six Feet Under," by contrast, is full of complex and subtle dialogue, including ironic turns of phrases that heighten the already-fraught interactions among the characters.

### 6.  *Sequence of Events*

**[15]** The sequence of events in the two works are different as well. "The Funk Parlor" opens with a younger John Funk attempting to seduce Jennifer Angeli at "Overlook Point." Their automobile crashes; John is blamed for the death; he leaves home; and returns only later at the death of his father. "Six Feet Under" begins with a montage of different scenes depicting each character's reaction to the death of Nathaniel Sr., who is killed in an automobile accident on the way to pick up Nate Jr. at the airport. Minutes before finding out, Nate engages in a sexual encounter with Brenda in an airport broom closet; Claire smokes crystal methamphetamine with a group of friends; and Ruth broods over dinner and Nate's favorite breakfast cereal. Shortly after these scenes, the Fisher children are reunited with their mother at the hospital to identify their father's body, thus beginning the exploration of their

complex relationships. While "The Funk Parlor" unfolds in a straight, linear trajectory, "Six Feet Under" employs repetition, dreams, and flashbacks to intensify certain scenes and conflate the real with the unreal.

## E

**[16]** At a very high level of generality, both works share certain plot similarities: the family-run funeral home, the father's death, and the return of the "prodigal son," who assists his brother in maintaining the family business. But "[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *See Berkic*, 761 F.2d at 1293. *See also Cavalier*, 297 F.3d at 824 ("basic plot ideas, such as this one, are not protected by copyright law"); *Shaw*, 919 F.2d at 1356 ("Copyright law protects an author's expression; facts and ideas within a work are not protected."). Beyond that, "[t]he stories do not share any detailed sequence of events." *Cavalier*, 297 F.3d at 824. *See Berkic*, 761 F.2d at 1293 ("Both deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants. To some extent, both works take their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization. But this degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are 'substantially similar.' "). The similarities recounted throughout appellants' brief rely heavily on *scenes à faire* — not concrete renderings specific to "The Funk Parlor" — and are, at best, coincidental. Consequently, the two works are not substantially similar.

## F

The district court disposed of the motion for summary judgment exclusively on the issue of substantial similarity and, in so doing, assumed for the sake of argument appellees'

access to the script. Although appellants wanted to take additional discovery on the issue of access, the court found it unnecessary because appellants could not meet the lower burden required by the substantial-similarity test. Appellants contend, however, that they should be given an opportunity to satisfy an even lower burden of proof under the "inverse-ratio rule," which applies to those cases in which a party demonstrates the alleged copier's "high degree of access" to the purportedly copied material. *See Three Boys Music*, 212 F.3d at 485 ("we require a lower standard of proof of substantial similarity when a high degree of access is shown") (internal citation omitted). Appellants contend that further discovery would allow them to demonstrate such access; that they would prevail under the lower burden of proof required in cases where such a degree of access is shown; and that the district court erred in failing to conduct that inquiry.

**[17]** We do not agree that appellants' invocation of the inverse-ratio rule requires reversal of the district court's decision. "No amount of proof of access will suffice to show copying if there are no similarities," *Krofft*, 562 F.2d at 1172, and, in this case, additional discovery would not change the fact that the two works lack any concrete or articulable similarities.[4] Thus, appellants would not be able to demonstrate unlawful copying even under a relaxed version of the substantial-similarity test. Consequently, we affirm the district court's summary judgment in appellees' favor as well as its ruling on additional discovery. *See Anderson,* 477 at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

---

[4]Moreover, this is not a circumstance in which the defendant has conceded access to the purportedly copied material. *See Metcalf*, 294 F.3d at 1075 (noting that a plaintiff's claim was "strengthened considerably by [the defendant's] concession of access to their works"); *Shaw*, 919 F.2d at 1361-62 (applying a lower standard of proof under substantial similarity in light of defendants' admission of access to the work in question).

## III

For the reasons stated above, the district court's summary judgment in appellees' favor is **AFFIRMED**.