Jill BERNAL p/k/a and d/b/a Jillian L'Amour, an individual,
Plaintiff,

v.

PARADIGM TALENT AND LITERARY AGENCY, business entity form unknown doing business in California, Marc Cherry, an individual, American Broadcasting Company, Inc., a corporation doing business in California; and Does 1–50, inclusive, Defendants.

No. CV 07–6445 SVW (PLAx).

United States District Court,
C.D. California.

Feb. 22, 2010.

Louis P. Petrich, Joel McCabe Smith, Daniel M. Mayeda, Los Angeles, CA, for Defendants Marc Cherry and American Broadcasting Companies, Inc.

Steven T. Lowe, Esq., Lowe Law, A Professional Corporation, Los Angeles,

CA, for Plaintiff, Jill Bernal p/k/a and d/b/a Jillian L'Amour.

Joseph P. Costa, Esq., Darius A. Vosylius, Esq., Theresa Johnson, Esq., Costa, Abrams & Coate, LLP, Santa Monica, CA, for Defendant, Paradigm Talent Agency and Literary Agency.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [35] [JS-6]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Defendants American Broadcasting Company ("ABC") and Marc Cherry move for summary judgment against Plaintiff Jill Bernal. Plaintiff claims that the television show *Desperate Housewives* was copied from Plaintiff's screenplay *Homeless*. For the following reasons, the Court GRANTS Defendants' Motion.

## II. FACTUAL BACKGROUND

Plaintiff completed her screenplay *Homeless* in 2002, and registered it with the Writer's Guild of America on November 19, 2002. In order to market her script, Plaintiff submitted her screenplay to various actors and producers. In early 2003, Plaintiff contacted the talent agency Paradigm to receive permission to submit her screenplay to Andrew Ruf, the talent agent for actor Billy Zane. (Plaintiff's Genuine Issues of Material Fact in Opposition to Summary Judgment ["GIMF"] 11–12.) Plaintiff spoke to Ruf's assistant Jack Kingrud, and obtained permission to submit

her screenplay. (*Id.*) On April 29, 2003, Plaintiff contends that she mailed the screenplay to Paradigm along with a cover letter briefly describing *Homeless,* as well as three other works. (GIMF 13.) Plaintiff contends that on May 29, 2003, she received a phone call from Ruf inquiring whether Plaintiff had an agent, and when production was going to begin on *Homeless.* (GIMF 23–24.) [1]

In 2003, Andrew Patman, another agent at Paradigm, represented Marc Cherry, the creator of *Desperate Housewives.* (GIMF ¶ 27.) [2] Cherry became a client of Paradigm on November 26, 2002. (GIMF ¶ 29.) Cherry claims to have finalized the teleplay for *Desperate Housewives* on September 15, 2002, after writing/revising the teleplay at least 5 times. (Cherry Decl. ¶¶ 5–6.) Plaintiff argues, however, that it is unclear what Cherry had written prior to April 2003, as opposed to after. (GIMF 34.) Plaintiff concedes that prior to April 30, 2003, Paradigm had begun "shopping" *Desperate Housewives* to television networks, production companies, and others. (GIMF 27; Patman Decl. ¶ 6(b).) Plaintiff also concedes that the version Cherry was shopping before April 30, 2003 did not include any portions taken from her screenplay. (GIMF 27.) However, Plaintiff argues that after April 30, 2003, Cherry copied elements from *Homeless* in order to make *Desperate Housewives* more marketable. (Opp'n at 6.) Paradigm "packaged" the *Desperate Housewives* series by attaching two of the actors represented by Paradigm, Terry Hatcher and Dana Delaney, to star in the series.[3]

---

1. Ruf disputes this fact. Ruf does not recall ever speaking with Plaintiff on the phone or otherwise. (Ruf Decl. ¶ 6(a).) Further, Ruf has no recollection of ever receiving *Homeless.* (*Id.* ¶ 6(b).) Plaintiff responds that Paradigm's phone records indicate that a call was made from Paradigm to Plaintiff on May 29, 2003. (GIMF 24; Pl. Compendium, Exh.

24 [Ruf Depo. at 18:18–23, 19:5–23 and Exhibit 24].)

2. Cherry became a client of Paradigm on November 26, 2002. (GIMF 29.)

3. Packaging a television series is defined by Patman as "when [an agency] control[s] one

(GIMF 28.) On September 3, 2003, Touchstone Pictures made an offer to Paradigm to purchase the *Desperate Housewives* pilot for ABC. (GIMF 36.) Thereafter, *Desperate Housewives* first aired on October 3, 2004. (GIMF 41.)

### A. Overview of *Homeless*

*Homeless* is the story of a homeless man, David Garrett, who returns to his old neighborhood, and is rehabilitated by a new neighbor. In her own letters pitching *Homeless* to potential actors, directors, and other film industry professionals, Plaintiff described *Homeless* as a "story [that] explores the question of whether or not work and love have the effect so powerful as to save us or destroy us or whether they are too ineffective as to be able to alter our destiny at all." (Pl.'s Compendium Exh. 15 [Letter from Plaintiff to Jude Law dated 08/02/05].) Plaintiff describes the main character David as:

> [A] quiet and sensitive down on his luck former airline pilot, ... whose life is nearly ruined when he is accused of his wife's murder. Made Homeless, after his fall from grace, David is taken in by [Suzanne] La Tour who believes David has potential to reenter the workforce. She gives him comfort and shelter while he regains the willpower and drive to reenter society though neighbors and family attempt to chase David from the neighborhood. David meanwhile, struggles with his past and the renewed pressures of society.

(Def. Compendium, Exh. N [Letter from Plaintiff to Francis Lawrence of Creative Artists Agency]; *see* Warwick–Smith Decl. ¶ 7.)

David begins the film as a homeless man in Southern California. Asleep in a park, David dreams that he is still a commercial airline pilot, and his wife Mindy is calling him home. Upon waking, David decides to return to his old neighborhood in the San Fernando Valley where he used to live when he was married to Mindy. While he is roaming his old neighborhood, Suzanne La Tour, who moved into the neighborhood after David left, backs out of her garage and accidentally hits David with her car.

At some point later, Suzanne embarks on a major house cleaning and enlists David's help. Suzanne's interactions with David lead to talk around the neighborhood. John, another suitor of Suzanne's, becomes jealous of David's interactions with Suzanne. John beats up David, warning David to stay away from Suzanne. Undeterred, David continues to stay and help Suzanne.

While he is in the neighborhood, David visits his old house. Standing on his former porch, David has a flashback of returning from a trip only to see his wife using drugs and participating in group sex. Although the screenplay has not explained how David became homeless, the audience learns that Mindy was not a faithful wife.

During this time, David continues to help Suzanne around the house. In return, Suzanne allows David to sleep in her guestroom. When Suzanne insists that David take a shower, however, he walks out. In his absence, Suzanne dates a series of particularly unappealing men.

When David returns, Suzanne's neighbors Penny and Dolly attempt to convince Suzanne not to help David, but Suzanne continues her charitable acts. Suzanne eventually gives David a makeover, giving him new clothes, and cutting his hair. After seeing the "new" David, Penny and Dolly are impressed, and end up flirting and vying for David's attention.

or more of the integral elements of the show." (GIMF 4.)

As the screenplay progresses, David regains his old job as a pilot. He also gets into another altercation with John, who knocks David out, ties him up, drives him out of town and throws him into a lake. David struggles out of the ropes, and swims to the surface of the lake.

Eventually, David ends up finding his way back to Los Angeles. While David is away, John takes Suzanne to his home, which overlooks her home. Suzanne learns that John has been stalking her this whole time.

David returns to Suzanne and reveals that his wife Mindy either committed suicide or died of an accidental drug overdose. David further confides that he was put on trial for her murder, but was acquitted. Suzanne and David reunite and make love. The screenplay ends with David fully employed, and married to Suzanne.

### B. Overview of *Desperate Housewives*

*Desperate Housewives* is a television show on ABC. The show follows the trials and tribulations of a group of suburban housewives who live on Wisteria Lane. The show is narrated by Mary Alice Young, who appears to lead a perfect life, but kills herself in the first scenes of the pilot episode. At Mary Alice's wake, the other residents of Wisteria Lane are astonished that Mary Alice could have committed suicide without any of them knowing she was in trouble.

Mary Alice's closest friends in the neighborhood are: Lynette Scavo, a stay-at-home mother of four who used to be a high-powered business woman; Susan, a klutzy single mom; Gabrielle Solis, a model-turned-trophy-wife; and Bree Van de Kamp, a perfectionist homemaker. At the wake, Susan meets Wisteria Lane's newest neighbor, Mike Delfino. Mike introduces

himself as a plumber, but the show soon reveals that he has come to Wisteria Lane with the secret purpose of investigating a missing person.

The show follows the lives of Susan, Bree, Gabrielle and Lynette. For this matter, Plaintiff only suggests that certain portions of *Desperate Housewives* were copied from *Homeless*. The alleged copied portions mainly involve the mystery surrounding Mary Alice's suicide. The show's plot during its first season revolves around the mystery of Mary Alice's suicide, which is a major storyline. The show reveals that Mary Alice and her husband Paul purchased their son Zach from a drug-addict named Deidre. Years later, Deidre approached Mary Alice and Paul, and attempted to regain custody of Zach. Mary Alice refused to relinquish Zach and ended up killing Deidre. Mary Alice, along with her husband, Paul Young, buried Deidre's body in a toy chest underneath their pool.

It is also revealed that Deidre is the very woman Mike is looking for. The show reveals that Mike is an ex-boyfriend of Deidre's who was hired by her father to find her. Mike later learns that Zach is actually his son.

In the second season, Mike and Susan eventually get married.

## III. ANALYSIS

### A. Legal Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir.2000). Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

**B. Copyright Infringement**

■ To establish copyright infringement, Plaintiff must show that she owns a valid copyright in *Homeless*, and that Defendants copied protected expressions from it. *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 n. 2 (9th Cir.1994). Defendants do not dispute Plaintiff's copyright ownership in *Homeless* for the purposes of summary judgment. Thus, the only question before the Court is whether Defendants copied protected expressions from the screenplay.

■ To prove copyright infringement, Plaintiff must show that Defendants copied protected elements of *Homeless* either through evidence of direct copying or through a showing that Defendants had "access" to Plaintiff's copyrighted material and that the two works at issue are "substantially similar." *See Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir.2006); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.2000). Here, Plaintiff does not allege direct copying by Defendants; rather Plaintiff claims that Cherry had access to *Homeless* through Paradigm, and that the works are substantially similar.

■ The required elements of access and substantial similarity are related—that is, the plaintiff's burden of proof on each element rests partly on the strength of plaintiff's showing on the other element. Thus, in rare cases, a plaintiff can prove copying even without proof of access "if he can show that the two works are not only substantially similar, but are so strikingly similar as to preclude the possibility of independent creation." *Meta–Film Assoc., Inc. v. MCA Inc.*, 586 F.Supp. 1346, 1355 (C.D.Cal.1984) (citing 3 Nimmer on Copyright § 13.01[B] and *Ferguson v. Nat'l Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir.1978)). In such instances, access will be inferred from the "striking" similarities between the works. *Id.* This rule only applies, however, where the works are so unmistakably similar that, "as a matter of logic, the only explanation [for the similarities] between the two works must be 'copying rather than . . . coincidence, independent creation, or prior common source.'" 4–13 Nimmer on Copyright § 13.02[B] (2009) (citations omitted).

▮ Conversely, under the "inverse ratio rule" recognized by the Ninth Circuit, where plaintiff shows a high degree of access, courts require a lower standard of proof of substantial similarity. *Three Boys Music*, 212 F.3d at 485.[4] To benefit from this rule, Plaintiff must offer proof of access which is greater than or "more compelling than that which is offered in the usual copyright case." *Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1176 (C.D.Cal.2001) (holding that the inverse ratio rule did not apply because "the general unavailability of Plaintiffs' works ... other than by way of their alleged 1994 and 1995 submissions to [Defendants] makes 'access' to Plaintiffs' copyrighted works somewhat *less* than might be available in a large number of cases.") (emphasis in original). Where plaintiff's theory of access is based solely on "speculation, conjecture or inference," plaintiff cannot demonstrate the high degree of access necessary to invoke the inverse ratio rule. *Rice*

*v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir.2003); *see id.* Finally, in Ninth Circuit cases applying the inverse ratio rule, generally the defendant concedes that he or she had access to plaintiff's copyrighted work; and this "concession of access ... [is] a prominent factor in [the court's] analysis." *Rice*, 330 F.3d at 1178 (citing to *Shaw v. Lindheim*, 919 F.2d 1353, 1361–62 (9th Cir.1990) and *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002)).[5]

### 1. Access [6]

▮ To prove access, Plaintiff must show that the Defendants had a "reasonable opportunity" or "reasonable possibility" of viewing Plaintiff's work prior to the creation of the infringing work. *Three Boys Music*, 212 F.3d at 482; *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987). Reasonable access requires more than a "bare possibility," and "may not be

---

4. It should be noted that the inverse ratio rule only works in one direction—that is, while a strong showing of access will result in a lower threshold showing of substantial similarity, a weak showing of access does not require a greater showing of similarities between the plaintiff's and defendant's works. *Three Boys Music*, 212 F.3d at 486 ("We have never held, however, that the inverse ratio rule says a weak showing of access requires a stronger showing of substantial similarity.").

5. Even in cases in which the inverse ratio rule applies, it is not clear just how much less the showing of substantial similarity need be, given the high degree of access. In *Shaw*, the Ninth Circuit applied the inverse ratio rule where defendants conceded access to plaintiff's script. 919 F.2d at 1361–62. However, the court merely held that the high degree of access was "a factor to be considered in favor of [plaintiff]." *Id.* at 1362. In contrast, *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir.2002), suggests that the plaintiff receives a greater benefit from the inverse ratio rule. In *Metcalf*, where the writer of the infringing work admitted that he received and read three ver-

sions of plaintiff's work and passed it on to the star actor in the infringing work, the court found that "[plaintiffs'] case is strengthened considerably by [defendant's] concession of access to their works." 294 F.3d at 1075. The court stated that if the trier of fact were to believe that the defendants read the scripts, "it could easily infer that the many similarities between plaintiffs' script and defendants' work were the result of copying, not mere coincidence." *Id.*

Although the exact effect of the inverse ratio rule is unclear, in this case, Plaintiff has not introduced sufficient evidence of access to invoke the inverse ratio rule (see *infra* section III.B.1); thus, the Court need not resolve this issue.

6. The requirement to offer proof of access cannot be excused in this case because, for the reasons discussed *infra* Section III.B.2, the two works at issue are not "so strikingly similar as to 'preclude the possibility of independent creation.' " *Jones v. Blige*, 558 F.3d 485, 493 (6th Cir.2009) (citing to *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 317 (6th Cir.2004)).

inferred through mere speculation or conjecture." *Three Boys Music*, 212 F.3d at 482. "In order to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir.2003) (affirming summary judgment against the plaintiff on the issue of access where the plaintiff produced "no reasonable documentation that he actually mailed [tapes of the allegedly infringed work to defendants]") (citing *Scott v. Paramount Pictures Corp.*, 449 F.Supp. 518, 520 (D.D.C.1978)).

■ Access is often proven through circumstantial evidence in one of two ways: "(1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work . . . or (2) the plaintiff's work has been widely disseminated." *Idema*, 162 F.Supp.2d at 1175 (citing to *Three Boys Music*, 212 F.3d at 482). Here, Plaintiff does not contend that her screenplay was widely distributed; instead, Plaintiff attempts to prove access by establishing a chain of events linking Plaintiff's screenplay with Defendants' work.

Specifically, Plaintiff argues that the creator of *Desperate Housewives*, Cherry, had access to *Homeless* through Plaintiff's submission of the screenplay to Paradigm in April 2003. Plaintiff contends that she received permission from the assistant to Andrew Ruf, a talent agent at Paradigm, to send Ruf the script. Plaintiff also contends that she had a telephone call with Ruf in May 2003, in which he confirmed receipt of *Homeless*. (GIMF 10–25.) Defendants dispute these facts. Ruf testified that he has no recollection of ever speaking with Plaintiff or receiving any of her work. (Ruf Decl. ¶ 6.) In response, Plaintiff offers evidence of her personal business records which make note of the call with Ruf's assistant in March 2003, un-

specified mailing receipts indicating that something was mailed on April 29, 2003, and telephone records from Paradigm indicating a call from Paradigm to Plaintiff on May 29, 2003. (GIMF 10–25.)

Plaintiff then argues that, once the *Homeless* screenplay was received by Ruf at Paradigm, there is a reasonable possibility that Cherry had access to it. In April 2003 and the succeeding months, Ruf was an agent representing actors, such as Billy Zane. Andy Patman was a Paradigm agent who represented various writers, including Cherry. Plaintiff surmises that Ruf could have given *Homeless* to Patman, who had a close relationship with Cherry and assisted him in the development of *Desperate Housewives*. (Opp'n at 5–6, 11–14.) Plaintiff introduces testimony from Patman to the effect that Paradigm was a relatively small agency and that Paradigm "packaged" the *Desperate Housewives* series, meaning that Paradigm represented both the writer (Cherry), two of the lead actors, and the executive producer. (GIMF 29; Pl. Compendium Exh. 23 [Patman Depo. at 60:2–21].) Thus, Plaintiff argues that there was collaboration between Paradigm agents representing writers (such as Patman) and those representing actors (such as Ruf) in connection with *Desperate Housewives*, and that Defendants' access to *Homeless* can be inferred through such collaboration. (Opp'n at 5–6.)

There are several problems with Plaintiff's theory of access. First, to logically support a claim that Defendant's copied Plaintiff's work, Defendants must have had access to Plaintiff's copyrighted work *before* the creation of the allegedly infringing work. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir.2007); *see Merrill v. Paramount Pictures, Corp.*, No. CV 05–1150 SVW (MANx), 2005 WL 3955653, *8 (C.D.Cal.2005). Here, Defendants pre-

sented undisputed evidence that Cherry wrote several drafts of the teleplay *Desperate Housewives* in 2002, many months before Plaintiff sent her screenplay to Paradigm. (Pl. Response to Defs.' Statement of Uncontroverted Facts ["PSUF"] 10, 13.) Defendants also presented uncontroverted evidence that Paradigm had begun "shopping" *Desperate Housewives* to television networks, production companies and others before Plaintiff sent *Homeless* to Paradigm in April 2003. (GIMF 34–35.) Thus, it is clear that, at a minimum, a working draft of *Desperate Housewives* was completed prior to Plaintiff's submission of *Homeless* to Paradigm. To counter this evidence, Plaintiff argues that Cherry added certain elements to *Desperate Housewives* after April 2003 that were purportedly copied from Plaintiff's screenplay. Thus, these later-added, allegedly infringing elements of *Desperate Housewives* form the basis of Plaintiff's claim.

However, Plaintiff has not offered any evidence of the changes made to Cherry's drafts of *Desperate Housewives* after April 2003. In other words, Plaintiff has pointed to no evidence to support her claim that what Cherry wrote prior to April 2003 was notably different than the pilot for *Desper-*

ate *Housewives* created after April 2003, and that the differences included elements similar to or derived from *Homeless*. For example, Plaintiff's expert, Simon Warwick–Smith performed a literary analysis comparing the similarities between Plaintiff's screenplay, on the one hand, and the pilot episode and several scripts and sample episodes from seasons 1–3 of *Desperate Housewives*, on the other. However, there is no comparison between earlier versions of Cherry's *Desperate Housewives* teleplay and the final product, nor is there any comparison between these earlier versions and Plaintiff's work. Thus, although Plaintiff contends that later-added elements infringed upon her work, on the face of this record, it is equally possible that everything Plaintiff claims is similar between her work and *Desperate Housewives* was created before April 2003.[7] Thus, it is not clear that Cherry had access to Plaintiff's work *before* he created the allegedly infringing material. This fact weighs heavily against a finding of access. *See Merrill,* 2005 WL 3955653, at *8 (finding that where the allegedly infringing work was created in mid–2000, and plaintiff could not remember when he sent the work to Defendant MTV Networks, and

---

7. Plaintiff contends that this shortcoming is a result of the insufficient record produced by Defendants. Plaintiff contends that Cherry's deposition testimony was unclear as to when Cherry created the earlier versions of the pilot for *Desperate Housewives,* and when exactly he created certain elements of the work. (*See* GIMF 46–52.) For their part, Defendants dispute this assertion. For example, Plaintiff contends that Cherry was unclear as to when he created the narrator character for *Desperate Housewives* (GIMF 52), but Cherry's deposition testimony is that he created the narrator by mid-summer 2002. (Pl. Compendium Exh. 22 [Cherry Depo. at 115: 5–20].) Nonetheless, Plaintiff clearly had access to earlier drafts of *Desperate Housewives,* which were referenced in Cherry's deposition; further, a draft of the *Desperate Housewives* tele-

play dated September 15, 2002 was included in Defendants' moving papers on this motion for summary judgment. (Defs.' Compendium Exh. E [Final Draft of *Desperate Housewives* dated 09/15/02]; *see* Reply at 19 (stating that Defendant Cherry produced six of his completed drafts to Plaintiff)). Thus, Plaintiff could have made some effort, even if not exact, to make a comparison of the earlier works using the dates that the documents themselves bear, to support her claim that the elements allegedly copied from Plaintiff's work were added after April 2003.

Finally, the Court notes that to the extent Plaintiff's argument rests on discovery pitfalls, Plaintiff did not make a request for further discovery under Fed. R. Civ. Proc. 56(f).

could not introduce evidence that it was prior to July 2000, this weighed against a finding of access).

Second, even crediting Plaintiff's testimony and documentary evidence that her screenplay was sent to Ruf at Paradigm on or about April 30, 2003,[8] and assuming that Cherry added the allegedly infringing elements after that time, Plaintiff's evidence of access is weak at best. Here, Plaintiff has not shown that either Patman or Cherry had any direct access to *Homeless*, but rather speculates that they could have received access through Ruf.

 Several courts have held that Plaintiff cannot create a triable issue of access merely by showing "bare corporate receipt" of her work by an individual who shares a common employer with the alleged copier. *See, e.g., Meta–Film*, 586 F.Supp. at 1358, *Jorgensen*, 351 F.3d at 52–53. Instead, to avoid summary judgment, a plaintiff must show that he submitted his work to an intermediary *who is in a position to transmit the plaintiff's work to the creators of the infringing work. Meta–Film*, 586 F.Supp. at 1355–56 (emphasis added). The intermediary can be a person who (1) has supervisory responsibility for the allegedly infringing project, (2) contributed ideas and materials to it, or (3) worked in the same unit as the creators. *Id.; see, e.g., De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir.1944) (sufficient evidence of access presented where plaintiff submitted her work to a literary agent who thereafter was consulted by the defendant as to research details regarding the infringing work). At a minimum, however, "the dealings between the plaintiff and the intermediary and between the intermedi-

ary and the alleged copier must involve some overlap in subject matter to permit an inference of access." *Meta–Film*, 586 F.Supp. at 1358 (citing *Kamar Int'l Inc. v. Russ Berrie and Co.*, 657 F.2d 1059 (9th Cir.1981) and *Russ Berrie & Co. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 989 n. 7 (S.D.N.Y.1980)). In sum, the plaintiff must show a sufficient nexus between "the individual who possesses knowledge of a plaintiff's work and the creator of the allegedly infringing work." *Id.* at 1357.

For example, in *Jorgensen*, the Second Circuit affirmed summary judgment as to some defendants on the issue of access where the plaintiff could not produce documentary evidence to show that he mailed out his work, and presented no evidence that those who did receive his work had any relationship with the creators of the allegedly infringing work. 351 F.3d at 52–53. Similarly, in *Meta–Film*, the court granted summary judgment on access where the plaintiff showed his work to a director who was under contract with the defendant studio and worked on the studio lot, but could not demonstrate any connection between the director and the studio's allegedly infringing project. 586 F.Supp. at 1356–59. As the court explained, "countless unsolicited scripts are submitted to numbers of individuals on studio lots everyday." *Id.* at 1357–58. "Under these circumstances, it is clearly unreasonable to attribute the knowledge of any one individual—especially a non-employee—to every other individual just because they occupy offices on the same studio lot." *Id.* The court in *Meta–Film* also rejected plaintiff's theory that access was shown by the fact that the director to whom she submitted

---

**8.** As stated above, Defendants dispute that Ruf ever received the *Homeless* script or that Ruf ever spoke with Plaintiff. However, Plaintiff's testimony, coupled with the documentary evidence supporting the mailing, and

Plaintiff's business records and Paradigm's phone records substantiating the claim that calls were made between Plaintiff and Paradigm are sufficient to support an inference that the script was received by Paradigm.

her work had dealings with an executive involved in producing the infringing work. *Id.* at 1358. The court found that the executive did not make any creative contributions to the infringing work and the meetings between the two men had nothing to do with either plaintiff's work or the infringing work. *Id.* Thus, access could not be inferred from those meetings.

Finally, in *Jones v. Blige*, the Sixth Circuit affirmed summary judgment on the issue of access where plaintiff merely demonstrated that she had sent her work to Andy McKaie, a Senior Vice President at Universal, and the allegedly infringing artists, Mary J. Blige and Andre Young, had a recording contract and a distribution joint venture, respectively, with Universal. 558 F.3d 485, 491–92 (6th Cir.2009). The court held: "While it is true that both Young and Blige dealt with Universal in certain respects, there is no evidence that either they or anyone else involved in the creation of [the allegedly infringing work] had any contact with McKaie or his division even indirectly." *Id.* at 492.

■ Here, Plaintiff submitted her work to Ruf at Paradigm. Ruf is not Cherry's agent, and there is no evidence that Ruf had any contact with Cherry. Further, there is no evidence that Ruf had any supervisory responsibility for *Desperate Housewives* or any involvement with the creation of the series at any time. (Pl. Compendium Exh. 23 [Patman Depo. at

34:13–35: 21] [testifying that he and Ruf never worked on any projects together].) These facts clearly cut against a finding of access. Nonetheless, Plaintiff argues that access can be inferred by the fact that Ruf and Patman worked at the same "small" agency, and Patman had involvement in the creation of *Desperate Housewives*.[9]

It is undisputed that Patman had some creative input in *Desperate Housewives*. Patman testified that he read a minimum of six drafts of *Desperate Housewives* prior to the airing of the pilot episode, that he reviewed the drafts with an eye toward giving feedback to Cherry about the work, and that he recalls a conversation in which he gave Cherry a suggestion about how to improve the *Desperate Housewives* script, which Cherry followed. (Pl. Compendium Exh. 23 [Patman Depo., at 44:19–45:22, 47:2–48:5].) Further, it is also undisputed that Patman and Ruf worked together for 10 years and knew one another. These facts distinguish Plaintiff's case somewhat from *Meta–Film, Jorgensen,* and *Jones,* because unlike in those cases, Plaintiff has shown that the person who received Plaintiff's screenplay (Ruf) had a relationship with a person who had some creative input in the infringing work (Patman). Whether this relationship creates a reasonable possibility that Ruf gave Patman and Cherry access to Plaintiff's screenplay depends, therefore, on the nature of that relationship.

9. Alternatively, Plaintiff appears to argue (without citation to any relevant authority) that because Paradigm, the entity, received Plaintiff's script, access can be shown by the fact that Cherry has an agency relationship with Paradigm. (Opp'n at 13.) Thus, Plaintiff argues that Cherry's access was not through an intermediary in this case because an entity, Paradigm, "which has legal authority to represent the purported 'creator'" received the work. (*Id.*)

Plaintiff's argument makes little sense. Paradigm, as an entity, cannot give Cherry

access to *Homeless*. The case law discussing access addresses whether actual persons are in a position vis-à-vis the creator to allow for reasonable access. Access is not a metaphysical concept, it requires a reasonable possibility that the actual creator(s) has seen (or heard or read) the work which is allegedly infringed. Thus, Paradigm cannot have access "on Cherry's behalf." Further, the argument is contradicted by the rule that bare corporate receipt does not impute knowledge of such receipt to all persons affiliated with the corporation.

The record demonstrates that Patman and Ruf worked in the same office, for the same agency, for 10 years. (Pl. Compendium Exh. 23 [Patman Depo., at 33:17–34:19].) The men worked on the same floor, but they worked on opposite sides of the room. (*Id.* at 33:17–34:6, 35:25–36:17.) Patman was a literary agent, while Ruf was a talent agent. They never worked on any projects together. (*Id.* at 34:7–19.) Patman testified that he and Ruf "would have no business situations that we would be collaborating on" and that he "could not think of an instance ... where I have worked on any project with [Ruf] whatsoever." (*Id.*) Further, Patman testified that Ruf never brought him a script and that Patman never talked with Ruf about any of the actors Ruf represents working on any of the scripts that Patman was packaging. (*Id.* at 35:12–21.) Patman testified that he and Ruf did not have a social relationship outside of work. (*Id.* at 34:20–35:8.)

Ruf's testimony is largely consistent with Patman's. Ruf testified that he has known Patman for 10 years but interacts with him "very infrequently." (Pl. Compendium Exh. 24 [Ruf Depo. at 14:3–11].) Generally, the most interaction Ruf has with Patman is when they leave work at the same time and Patman makes jokes with Ruf. (*Id.* at 14:12–23.) Finally, both Patman and Ruf stated that they have never passed along a screenplay conceived or written by someone else to a writer represented by Paradigm. (Ruf Decl. ¶ 6(d); Patman Decl. ¶ 6(d).)

Plaintiff has offered no evidence to contradict these facts. Instead, Plaintiff points out that although Ruf is a talent agent and Patman is a literary agent, these two divisions worked together to "package" certain works, including *Desperate Housewives*. (Opp'n at 14; GIMF 60.) At best, however, this raises the *theoretical possibility* that Ruf and Patman could have worked together on a project. But in light of the agents' undisputed testimony that, in fact, they never worked together on *Desperate Housewives* or anything else, this amounts to nothing more than pure speculation. Other than the fact that Ruf and Patman worked for the same company, there is no evidence that would permit an inference of access.

In light of this record, Plaintiff has not presented more than a scintilla of evidence to support her theory that Defendants had a reasonable possibility of access to *Homeless*. Even crediting that Ruf may have received *Homeless*, there is nothing in Ruf's and Patman's relationship to indicate, beyond pure speculation, that Ruf passed the *Homeless* script onto Patman and/or Cherry. There is no evidence that discussions between Ruf and Patman involved any overlap in the subject matter of discussions between Patman and Cherry. *See Meta–Film*, 586 F.Supp. at 1358. Instead, the only reasonable inference from the record is that Ruf and Patman are the type of distant colleagues who occasionally engaged in idle chit-chat while riding the elevator together or attending an office holiday party. In short, they simply worked for the same company. Under the reasoning of *Meta–Film, Jorgensen, Blige,* and *Merrill,* this is insufficient to raise a triable issue of fact.

For this reason, Defendant's motion for summary judgment is granted. Further, even were the Court to conclude a triable issue of fact existed regarding access,[10] an

---

**10.** It goes without saying that Plaintiff's evidence of access is not sufficient to invoke the inverse ratio rule. Certainly, there is no concession of access here by Defendants, and Plaintiff has not shown that any intermediary who received her screenplay (Ruf) was in a position to transmit the screenplay to the creators of *Desperate Housewives*. Thus, the evi-

independent ground for summary judgment exists because the works are not substantially similar.

### 2. Substantial Similarity

To determine whether two works are substantially similar, the Ninth Circuit applies a two-part test consisting of extrinsic and intrinsic components. *Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1174 (9th Cir.2003). The extrinsic test is an objective comparison of the two works. The Court must consider "whether [the works] share a similarity of ideas and expression as measured by external, objective criteria." *Swirsky v. Carey,* 376 F.3d 841, 845 (9th Cir.2004). The extrinsic test requires an "analytic dissection" of the works, and is often aided by expert testimony. *Id.*

The second part of the substantial similarity test, the intrinsic component, is subjective and depends solely on the response of the ordinary lay observer. *Berkic v. Crichton,* 761 F.2d 1289, 1292 (9th Cir.1985). "To that extent, expert testimony or the comparison of the individual features of the works is inappropriate in applying the intrinsic test." *Id.* Instead, the trier of fact "ordinarily decides whether the 'total concept and feel' of the two works is substantially similar." *Id.* In comparing a film with a written work, for example, the intrinsic component requires a subjective inquiry into whether a reasonable audience would recognize the allegedly infringing work as a dramatization of the plaintiff's creation. *Id.; Kouf v. Walt*

*Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir.1994).

"For summary judgment, only the extrinsic test is important." *Kouf,* 16 F.3d at 1045. "A plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury cannot find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.* Further, because the intrinsic test relies on the subjective judgment of the ordinary person, it must be left to the jury. *Swirsky,* 376 F.3d at 845. Thus, the Court's analysis on summary judgment is limited to the extrinsic test.

Where literary works (films, screenplays, television series, etc.) are at issue, the extrinsic test is an objective evaluation of "the articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Id.* In applying the test, the Court must distinguish between protectable and unprotectable material, because a party claiming infringement may not rely on unprotected elements. *Rice,* 330 F.3d at 1174. For example, general plot ideas are not protectable and cannot give rise to a copyright infringement claim. *See Berkic,* 761 F.2d at 1293 ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind."). Further, the doctrine of *scenes a faire* "holds that expressions indispensable and naturally associated with the treatment of a given idea 'are treated like ideas and are therefore not protected by copyright.' " *Rice,* 330 F.3d at

---

dence falls far short of the "high degree of access" required to invoke the inverse ratio rule. *See Rice v. Fox Broadcasting Co.,* 330 F.3d 1170 (9th Cir.2003) (rejecting application of the inverse ratio rule where Plaintiff surmised that because an agent who had clearly seen Plaintiff's work, Wohl, represented a client, Nash, who was involved in the

creation of the allegedly infringing work, Nash must have had access to Plaintiff's work; the court found that such a theory was based on "speculation, conjecture and inference which are far less than the 'high degree of access' required for the application of the inverse ratio rule").

1175 (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994)). Accordingly, the extrinsic test examines "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293.

■ Summary judgment on the issue of substantial similarity is appropriate "if no reasonable juror could find substantial similarity of ideas and expression." *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1045). Although summary judgment is not highly favored on the issue of substantial similarity in copyright cases, "substantial similarity may often be decided as a matter of law." *Id.* (quoting *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)). Indeed, the Ninth Circuit "ha[s] frequently affirmed summary judgment on the issue of substantial similarity." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir.1990). As discussed below, the Court concludes that no reasonable jury could find that *Desperate Housewives* and *Homeless* are substantially similar under the extrinsic test.

#### i. Evidence Considered

The Court engaged in a detailed analysis of the works at issue. Specifically, the Court reviewed: (1) the *Homeless* screenplay written by Jill Bernal, dated September 2, 2002; (2) the teleplay for the pilot episode of *Desperate Housewives* by Marc Cherry, dated September 15, 2002; (3) the DVD of the pilot episode of *Desperate Housewives*; (4) all 23 episodes of the first season of *Desperate Housewives* on DVD; (5) seven select episodes from season two

of *Desperate Housewives* on DVD; (6) 3 select episodes from season three of *Desperate Housewives* on DVD; and (7) 2 select episodes from season 4 of *Desperate Housewives* on DVD. In so doing, the Court focused special attention on those episodes of *Desperate Housewives* that Plaintiff identified as demonstrating similarities to the *Homeless* screenplay. Further, the Court largely focused its review on the first two seasons of *Desperate Housewives*, in light of Plaintiff's expert's contention that "the similarities occur mainly in the opening episodes, and then occur less frequently as the episodes progress." (Warwick–Smith Report, at 4); *see, e.g., Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072 (9th Cir.2006) (Ninth Circuit affirmed the district court's grant of summary judgment for defendants on the issue of substantial similarity where the district court reviewed plaintiff's screenplay and the first three episodes of defendant's allegedly infringing television series); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124 (C.D.Cal.2007) (district court reviewed plaintiff's script and television treatment, on the one hand, and eight episodes of defendants'150–episode television series, on the other, for substantial similarity); *Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group, Inc.*, 156 F.Supp.2d 1148, 1157 (C.D.Cal. 2001) ("It is the copyright plaintiff's burden to identify the elements for [the extrinsic test] comparison."). The Court has also considered the parties' briefs and supporting papers, as well as the expert reports submitted by Plaintiff's expert, Simon Warwick–Smith ("Warwick–Smith"), and Defendant's expert, Arnold Margolin ("Margolin").[11]

---

11. Defendants introduced the expert report of Arnold Margolin ("Margolin") in connection with their Reply to Plaintiff's Opposition. Plaintiff objected to the introduction of new

evidence and argument on reply, and asked the Court for leave to file a proposed sur-reply. (Pl.'s Ex Parte Application for Leave to File Proposed Sur–Reply, Docket No. 70.)

Before the Court engages in its detailed analysis of the works, a brief word is required regarding the use of expert testimony in this case. Here, Plaintiff relied almost exclusively on the 150–page report of Warwick–Smith to argue that *Homeless* and *Desperate Housewives* are substantially similar. The report contains a few pages of general conclusions about the similarities between the works, a summary and plot synopsis of *Homeless* and certain episodes of *Desperate Housewives,* and a 133–page chart indicating a side-by-side comparison of certain events, dialogue, and characters in each work. Defendants argue that the Court should reject Warwick–Smith's report because he is not qualified to render an expert opinion regarding literary analysis. (Reply at 7–11; Motion in Limine No. 1 [Docket No 48].) [12] Defendants also submit the report of their own expert, Arnold Margolin ("Margolin"), to rebut the alleged similarities identified by Warwick–Smith. (Declaration of Joel McCabe Smith in Reply to Pl. Opp'n, Exh. A [Margolin Decl.].)

 The Court holds that both Warwick–Smith and Margolin are qualified to render an opinion regarding whether the objective components of the works are substantially similar. Although Warwick–Smith's background is primarily in publishing, he has read and evaluated hundreds of manuscripts throughout his 20–year career and has compared the manuscripts to prior works for purposes of presenting the works to publishers. (Pl. Compendium Exh. 16 [Curriculum Vitae of Warwick–Smith].) [13] This experience in reviewing and comparing hundreds of manuscripts is sufficient to qualify Warwick–Smith to analyze the works in this case. Finally, as Plaintiff's correctly argued, Warwick–Smith's lack of experience *as an expert witness* in copyright cases goes to the weight of his testimony, not its admissibility. (Opp'n to Def. Mot. in Limine No. 1, at 8); *Bitton v. Int'l Transport, Inc.,* 437 F.2d 817, 822 (9th Cir.1970) (noting an expert's "lack of specific experience goes to the weight not admissibility" of his testimony).

 Defendants' expert, Margolin, has extremely relevant experience. For over forty years, Margolin has worked for the Writers Guild of America as an arbiter in disputes involving the proper credits for writers in television and film. (Margolin Decl. ¶¶ 1–2.) In that capacity, Margolin has read numerous works to determine what credit, if any, the participating writers should receive for the works. (*Id.*) Margolin has also written 10 feature films, eight movies for television, and over 35 pilots for primetime television. (*Id.* ¶ 3.) He has taught screenwriting at the college level, and has been engaged as an expert in more than three dozen copyright infringement litigations. (Margolin Decl.,

The Court granted Plaintiff's request on November 24, 2008 and has considered Plaintiff's Sur–Reply, as well as its Opposition to Defendant's Motion in Limine No. 1 in ruling on Defendant's summary judgment motion. (*See* 11/24/08 Motion Ruling). Thus, no prejudice will result from the Court's consideration of Margolin's report.

12. Defendants also fault Warwick–Smith's methodology because he did not review Defendant Cherry's 2002 draft teleplays of *Desperate Housewives* that predated Plaintiff's 2003 transmission of *Homeless* to Paradigm.

(Reply at 9.) The Court agrees that the failure to review these earlier drafts casts doubt on Plaintiff's theory of access, which is addressed *supra.*

13. As Warwick–Smith explained, publishers are interested in this comparison because they want to know whether a certain work is similar to a source already on the market so as to assess whether the new work will sell. (Lowe Decl., Exh. A [Warwick–Smith Depo., at 49:6–12].)

Exh. 1 [Curriculum Vitae].) In sum, both experts are qualified in this case.[14]

That said, the existence of dueling expert reports does not necessarily present a triable issue of fact for the jury. Numerous cases have found in favor of defendants on the issue of substantial similarity despite the existence of expert testimony offered by plaintiffs. *See, e.g., Rice,* 330 F.3d at 1180 (affirming summary judgment for defendants where the parties each submitted expert reports); *Olson v. Nat'l Broadcasting Co., Inc.,* 855 F.2d 1446, 1451, 1453 (9th Cir.1988) (affirming the district court's grant of judgment notwithstanding the verdict after Plaintiff offered expert testimony at trial that sought to demonstrate similarity between the works); *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465 (9th Cir.1992) (affirming summary judgment for defendants where plaintiff presented expert testimony on the issue of substantial similarity). Thus, summary judgment on the issue of substantial similarity is appropriate where, even considering the experts' testimony, no reasonable jury could conclude that the objective components of the works are substantially similar. *Flynn v. Surnow,* No. CV 02–9058–JFW (PLAx), 2003 WL 23411877, *4 (C.D.Cal., Dec. 9, 2003) (citing to *Narell v. Freeman,* 872 F.2d 907, 910 (9th Cir.1989)).

Further, this case does not involve a highly technical area of expertise. Unlike a patent case comparing two technical devices, or a copyright case involving computer software or music, this case involves the comparison of a film script to a television series. The works are targeted at a general audience and deal with subject matter readily understandable by any ordinary person, including the Court. Thus, expert testimony is far less critical in a case like this than it is in a case where specialized knowledge is required to dissect the objective components of the copyrighted works. *See, e.g., Brown Bag Software,* 960 F.2d at 1473–74 (relying on expert testimony to identify the objective points of comparison among different computer software programs); *Swirsky v. Carey,* 376 F.3d 841, 847–48 (9th Cir.2004) (relying on expert testimony comparing the objective elements—pitch, melodies, baselines, tempo, chords, structure, and harmonic rhythm—of musical works); *Chiate v. Morris,* Case No. 90–55428, 1992 WL 197591, *5 (9th Cir., Aug. 17, 1992) (finding that expert testimony by a musicologist is crucial to proving objective similarity of songs); *see also* Dowd, COPYRIGHT LITIGATION HANDBOOK § 15:27 (2d ed.2009) (noting that expert testimony is often helpful in cases involving computer programs and functional objects, but will "seldom be necessary" to determine substantial similarity between literary works). Indeed, several other courts have cast doubt on whether expert testimony regarding substantial similarity is *ever* helpful in a case involving the comparison of two literary works. *See e.g., Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 123 (2d Cir.1930);[15] *Stromback*

---

**14.** Notably, the Court agrees with Plaintiff that, "there is no particular type of background that qualifies one to compare a screenplay to television scripts." (Pl.'s Opp'n to Mot. in Limine No. 1, at 9.) As explained below, the analysis required is not highly technical. With regard to literary works, like those at issue here, the analytic task is to compare standard elements—plot, characters, dialogue, mood, setting, and so forth—for substantial similarity. Thus, while a person with a great deal of experience writing literary works and reading manuscripts or television scripts certainly has the necessary background, an avid movie buff and television watcher might also be qualified to render an opinion in this case.

**15.** In *Nichols,* Judge Learned Hand famously exclaimed that expert testimony comparing literary works "ought not be allowed at all" because "it cumbers the case and tends to

*v. New Line Cinema,* 384 F.3d 283, 295 (6th Cir.2004); *Kindergartners Count Inc. v. Demoulin,* 249 F.Supp.2d 1214, 1232 (D.Kan.2003). The Ninth Circuit generally takes a broader view, and often finds that expert testimony is appropriate regarding the objective substantial similarity of literary works. *Olson,* 855 F.2d at 1449; *Sid & Marty Krofft Television Productions, Inc.,* 562 F.2d 1157, 1164 (9th Cir.1977). Nonetheless, several Ninth Circuit cases have recognized the limitations of expert testimony in this area. *See Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1179 (9th Cir.2003) (upholding the district court's decision to disregard the parties' expert reports where the court engaged in an extensive analysis of the alleged similarities in expressive elements of the works and "neither expert opinion [was] very relevant to the conclusions drawn by the court"); *Olson,* 855 F.2d at 1450–51 (holding that the district court's decision to discount expert testimony was appropriate where the expert de-emphasized dissimilarities between the works and compared *scenes a faire* ); *Shaw v. Lindheim,* 919 F.2d 1353, 1357 (9th Cir.1990) (viewing the expert report with caution where it focused on random similarities in the works).

Here, the Court has considered the lists of alleged similarities offered by Warwick–Smith. However, the Court recognizes that such lists are inherently subjective, and therefore views them with caution. *See Olson,* 855 F.2d at 1450. For example, the Court found numerous instances in which Plaintiff's expert mischaracterized the events to make the works appear more similar; the Court has discounted those instances in its analysis. Moreover, Warwick–Smith's report focuses mainly on a lengthy list of random similarities, with little analysis as to why such alleged similarities are qualitatively important to the two works. Indeed, the list is arguably something that the Plaintiff could have created on her own, without the aid of an expert. In sum, the Court has considered Warwick–Smith's expert report to identify those elements of each work that Plaintiff contends are substantially similar. *See Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1473–74 (9th Cir.1992) (the district court considered the declaration of Plaintiff's expert "to the full extent permitted under our circuit's law," where the court relied on the disputed expert affidavit to identify objective components for comparison, but did not consider the expert's opinion itself.) [16]

Similarly, the Court has considered Defendant's expert report, and the objective facts stated therein regarding the works; however, like Plaintiff's report, the analysis offers little to that which the Court has observed in its own independent review of the works.

Even considering the expert reports, the Court concludes that no reasonable jury could find that *Homeless* and *Desperate Housewives* are substantially similar as to any of the components of the extrinsic test—plot, themes, dialogue, mood, setting, pace, characters, or sequence of events.

confusion, for the more the court is led into the intricacies of dramatic draftsmanship, the less likely it is to stand upon the firmer, if more naïve, ground of its considered impressions upon its own perusal." 45 F.2d at 123.

**16.** While *Brown Bag Software* supports the view that only the expert's identification of similar objective elements is relevant, the Court has nonetheless considered Warwick–Smith's ultimate opinions. Even doing so, however, reasonable minds could not differ as to the absence of substantial similarity of expression between the two works. *See Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984).

### ii. Objective Analysis

#### a. Plot

The Ninth Circuit has repeatedly held that "[g]eneral plot ideas are not protected by copyright law . . . ." *Kouf,* 16 F.3d at 1045 (quoting *Berkic,* 761 F.2d at 1293 (finding no substantial similarity between two works about exposing a criminal organization that murders healthy people and sells the organs for transplants)); *see also Shaw,* 919 F.2d at 1356 (noting that copyright law protects a writer's expression of ideas, not the ideas themselves). Here, both works involve the death of a woman who lives in a suburban neighborhood, a leading man who comes to the neighborhood with a mysterious past, and a leading female character who is romantically involved with the leading man. Beyond these rather abstract similarities, the plots of each work are substantially different.[17]

First, the deaths of Mary Alice and Mindy play different roles in the plots of each work. The mystery surrounding Mary Alice's suicide drives the plot for the first season of *Desperate Housewives.* The season begins with her suicide, and the women of Wisteria Lane spend the whole season learning clues and eventually learning the truth of Mary Alice's past life. In contrast, although Mindy's death leads to David's homelessness, *Homeless* does not reveal Mindy's death until the end of the work. The plot instead focuses on David's rehabilitation.

Second, although both leading men, Mike and David, have mysterious pasts, their reasons for coming to the neighborhood, as well as their pasts, are considerably different. In *Homeless,* David returns to the neighborhood after he has a dream where Mindy tells him to go home. David's mysterious past is that David used to live in the neighborhood, but became homeless after he was accused and then acquitted of Mindy's murder. Mike, in contrast, moves to Wisteria Lane to investigate Deidre's disappearance.

Plaintiff's expert attempts to compare the storylines involving Mike and David, but in doing so, he engages in a wholesale mischaracterization of the works. Specifically, Warwick–Smith's report offers the following comparison:

> David lives on Suzanne's street while searching for the reasons that Mindy died. Suzanne finances his search (p. 44 she pays him for work) and encourages him to resolve the matter. She assists him with money, work, and shelter. Mike lives on Susan's street while searching for the reasons that Deidre died (Eps. 01.21). Noah finances his search and encourages him to resolve the matter (Eps. 01.02). Noah assists Mike with money, work, shelter, and a gun for protection.

(Warwick–Smith Report, at 6.) This comparison is flatly inaccurate. In *Homeless,* David is not searching for reasons that Mindy died, nor is Suzanne financing his search. Suzanne gives David money because he is homeless and has nothing; Suzanne sees something worthwhile in David and wants to help him. When Suzanne gives David money, she knows little to nothing about him. She does not learn about his past until much later in the work; thus, it is plainly absurd to contend that she is financing any type of search for clues regarding David's deceased wife. Further, there is no indication in *Homeless* that David returns to the neighborhood

---

**17.** Plaintiff's expert concedes as much in his report. (Warwick–Smith Report, at 3 ["As already stated, the plots of [*Homeless*] and [*Desperate Housewives*] have threads in common but overall they are dissimilar."].)

because he is looking for clues about his wife. In fact, when David finally tells Suzanne about Mindy's death, he knows exactly what happened to Mindy, and speaks in the past tense. It appears that he already knows that Mindy's death was a suicide, and he has already been acquitted in the murder trial. Finally, Suzanne is not encouraging David to "resolve the matter" in the sense of resolving how Mindy died, rather she merely encourages David to come to terms with her death and try and regain his life back. This is markedly different than the plot in *Desperate Housewives.* There, Mike returns to Wisteria Lane with the specific purpose of learning about Deidre's death, and Deidre's father Noah finances this search so that they can both learn the truth. It is eventually revealed that Mary Alice, the narrator of *Desperate Housewives,* killed Deidre.

Third, the relationship between David and Suzanne is quite different from the relationship between Mike and Susan. In *Homeless,* Suzanne rehabilitates David and eventually marries him. In *Desperate Housewives,* Susan pursues Mike as a love interest from the very beginning of their relationship. Although Susan and Mike marry in the second season of the program, their relationship does not have a similar rehabilitation dynamic.

 In Warwick–Smith's summary of how *Desperate Housewives* and *Homeless* have similar plots, Warwick–Smith concludes that the "combination of murder-mystery theme with disembodied spirit voiceover is a unique aspect to *Homeless* that is used throughout *Desperate Housewives.*" (Warwick–Smith Report, at 4.) However, the use of a dead narrator is not a unique plot element. Classic movies such as *Sunset Boulevard,* as well as con-

temporary favorites such as *American Beauty,* use disembodied voiceovers. Moreover,.Mindy's and Mary Alice's voiceovers play very different roles in each of the works. Mindy's voiceover is considerably less prominent than Mary Alice's. Mindy's voiceover appears a total of four times in Plaintiff's work: First, Mindy calls to David in the opening dream saying, "Come home, David. David come home." (Pl. Compendium Exh. 1 [*Homeless* Screenplay], at 2.) Second, while David is in Suzanne's bathroom, Mindy's voice tells David, "David, Honey. You're home." (*Id.* at 81.) Third, Mindy states, "David. It's so good to *see* you," again while David is in Suzanne's bathroom. (*Id.* at 94.) Finally, Mindy tells David "You're home" at the end of the screenplay. (*Id.* at 120.). In contrast, Mary Alice's disembodied voice is heard throughout the *Desperate Housewives* episodes. Generally, Mary Alice narrates the beginning and ending scenes of every episode. Moreover, unlike Mary Alice, who predominantly speaks *about* the characters and narrates substantial moments in the work, Mindy only speaks *to* David and *does not* narrate the background story. As such, no reasonable jury could find the use of the disembodied voiceover to be substantially similar. Further, the general idea of a murder-mystery is not copyrightable.

Finally, although Warwick–Smith compiles many pages of plot comparisons,[18] his comparisons are often based on mischaracterizations, and even where they are accurately stated, constitute merely a list of random similarities. For example, Warwick–Smith tries to draw a comparison between two scenes involving Gabrielle in *Desperate Housewives,* and Penny in *Homeless.* In *Desperate Housewives,*

**18.** Many of Warwick–Smith's plot comparisons appear under the heading "Character

Comparisons."

Gabrielle is pregnant and loses her baby due to a fall down the stairs. She later acts as though she is not grieving and goes shopping. (Warwick–Smith Report at 71.) Warwick–Smith compares this to a scene in *Homeless* by summarizing: "Penny loses her fetus. She claims to be happy pretending to move on without a care for her recent lost.... She flirts with David who looks promising." (*Id.*) But there is no indication in *Homeless* that Penny lost her baby. Thus, this is not an accurate point of comparison.

▆▆ As another example, Warwick–Smith notes that both *Homeless* and *Desperate Housewives* contain a scene where the leading man is hit by a car. In *Homeless*, Suzanne meets David when she backs into him upon pulling out of her driveway. In describing this event, Warwick–Smith notes: "A car strikes David down in front of Suzanne's house. Suzanne drives the car. It's an accident. Suzanne stops. This accident allows David to meet Suzanne whom he'll later marry." (Warwick–Smith Report, at 74.) Warwick–Smith compares this scene to a scene from season two of *Desperate Housewives:* "A car strikes Mike down in the street in front of Susan's house. A neighbor of Susan's drives the car. It's an intentional hit and run. The neighbor doesn't stop. This accident postpones Susan's marriage to Mike." (*Id.*) Warwick–Smith attempts to explain how these two scenes are similar by stating, "The [*Desperate Housewives*] character is doing the opposite choice. The character flees rather than stays and the character intends to strike down the man Susan will marry rather than have it done accidentally. The air of danger ex-

ists in this scene in both scripts." (*Id.*) Warwick–Smith uses similar comparisons in an attempt to show that the works are substantially similar. However, the mere similarity of a character being hit with a car is a general plot idea that is not protectable.[19] *See Olson v. Nat'l Broadcasting Co.*, 855 F.2d 1446, 1450–51 n. 3 (9th Cir.1988). Further, the expression of this idea is markedly different in each work. Opposite expressions of a general idea are not copyright violations.

While it is not necessary to address each comparison in Warwick–Smith's 133–page report, one more example serves for illustrative purposes. Warwick–Smith compares the following scenes: In *Homeless*, "John kidnaps and abandons David to remove him as a romantic threat." (Warwick–Smith Report at 108.) In *Desperate Housewives*, "Mike kidnaps Paul and abandons him in the desert. [Mike] confronts Paul about killing Deidre who Mike dated fifteen years prior before he went to jail." (*Id.*) While it is true that in both works, a male character is kidnapped, the two events are qualitatively different. As noted, in *Homeless*, John tries to get rid of David as a romantic rival for Suzanne's affections. He throws David in a lake to drown him, but David manages to escape his bondage and swim to the surface. In contrast, in *Desperate Housewives*, Mike believes that Paul killed his former girlfriend, Deidre, and takes Paul to the desert to kill him out of rage. Paul confesses that, years prior, Deidre sold her baby to Paul and Mary–Alice, and that Mary–Alice killed Deidre during a struggle when Deidre returned to take her child. Mike is stunned and his actions indicate that he realizes that the child Deidre sold to Mary

---

**19.** Warwick–Smith seems to concede as much in his report, which states: "Here, in the world of sitcoms, infidelity, alcohol, theft, sex, being hit by a car, smoking dope, guns, betrayal etc—occur frequently in scripts. I have generally ignored such comparisons unless there is some pointed, compelling commonality or pattern that is clearly unique." (Pl. Compendium Exh. 17, pg. 4.)

Alice might be his child. Mike decides not to kill Paul. These events might appear similar when described in the abstract, but in context, they are exceedingly different. In *Desperate Housewives,* Mike and Paul are not romantic rivals; Mike does not intend to kill Paul out of jealousy. Further, Paul has a specific relationship with Mike's ex-girlfriend, whereas John in *Homeless* has nothing to do with Mindy or her tragic death. The relationship and history between the characters is different, the motivations for the kidnaping are different, and even the end results of the scenes are different.

In sum, Plaintiff's argument of plot similarities essentially boils down to an abstract list of random similarities between *Homeless* and *Desperate Housewives.* The Ninth Circuit has repeatedly held that "such lists of similarities ... are inherently subjective and unreliable," and a court should be "particularly cautious where, as here, the list emphasizes random similarities scattered throughout the works." *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984) (summary judgment granted where there was no substantial similarity in the sequence of events, mood, dialogue or characters, and plot similarities existed "only at the general level for which plaintiff cannot claim copyright protection"); *see also, Olson,* 855 F.2d at 1450; *Kouf,* 16 F.3d at 1045–46; *Shaw,* 919 F.2d at 1362. Further, Warwick–Smith's list focuses on general unprotectable elements that are not arranged in any particular sequence.

In *Metcalf v. Bochco,* the Ninth Circuit held that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." 294 F.3d 1069, 1074 (9th Cir.2002). In *Metcalf,* however, the sequence of unprotectable elements went far beyond the basic plot. The Ninth Circuit found the similarities between the works "striking." *Id.* at 1073. The Ninth Circuit found:

> Both [works] are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1073–74. In sum, the works had "the same setting in the same location and city ... dealt with identical issues, had similar looking characters in identical professions, facing identical challenges" and had an "identical" sequence of events. *Identity Arts v. Best Buy Enterprise Servs.,* No., 05–4656 PJH, 2007 WL 1149155, at *27 (N.D.Cal., Apr. 18, 2007) (summarizing the facts in *Metcalf*). The Ninth Circuit noted that "the similarities proffered by [the plaintiffs] are not protectable when considered individually; they are either too generic or constitute 'scenes a faire' .... [h]owever, the presence of so many generic similarities and the common patterns in which they arise"

allowed the plaintiff to satisfy the extrinsic test. *Id.* at 1074.

*Metcalf* does not apply to the present case. In *Metcalf,* the generic similarities were voluminous, nearly identical, and occurred in the same pattern. Here, *Homeless* and *Desperate Housewives* do not share nearly as many generic similarities as the two works in *Metcalf.* The elements that Plaintiff contends are similar are, in fact, markedly different when viewed in context. Further, Plaintiff has not pointed to any common pattern of unprotected elements that occur in the same sequence in both works. *See Zella v. Scripps Co.,* 529 F.Supp.2d 1124, 1138 (C.D.Cal.2007) (noting that "many courts have been reluctant to expand [the concept of finding copyright protection for a pattern of unprotected elements in literary works] beyond the clear-cut case in *Metcalf,*" and granting summary judgment for defendants where plaintiff "cobbled together" a list of generic elements that did not form a specific pattern); *Flynn v. Surnow,* No. CV 02–9058–JFW (PLAx), 2003 WL 23411877, *9 (C.D.Cal., Dec. 9, 2003) (rejecting a *Metcalf* argument where the similarities "are randomly scattered throughout the works and have no concrete pattern ... in common"); *Identity Arts,* 2007 WL 1149155, at *28 (declining to apply *Metcalf* where the works shared only a few "striking similarities" and, broadly speaking, a similar sequence of events; "the cumulative weight" of the

alleged similarities paled in comparison to that in *Metcalf*).[20]

The differences between *Homeless* and *Desperate Housewives* are vastly more substantial than the similarities. In this manner, the present case is similar to *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.,* 462 F.3d 1072 (9th Cir.2006). There, the Ninth Circuit found that the plaintiff in *Funky Films* did not satisfy the extrinsic test. 462 F.3d at 1078. In *Funky Films,* both works depicted family-run funeral homes where the father died leaving the family's two sons to run the funeral home. *Id.* at 1077. Both works included the return of the prodigal son, a competitive bid by a rival business, and one son changing his religious affiliation to get business. *Id.* The Ninth Circuit found that "[a]t first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood pace, dialogue, or sequence of events." *Id.* at 1078. The Ninth Circuit concluded that:

> At a very high level of generality, both works share certain plot similarities: the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business. But general plot ideas are not protected by copyright law, they remain forever the common property of artistic mankind. Beyond

---

**20.** *Metcalf* is also distinguishable because in *Metcalf* the defendant conceded access to plaintiffs' work; thus, the inverse ratio rule applied. 294 F.3d at 1075. The Ninth Circuit held that this concession "strengthened considerably" plaintiffs' case. *Id.* In *Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1179 (9th Cir.2003), the Ninth Circuit explicitly declined to apply *Metcalf* to a case in which no concession of access was made. The court held: "[H]ere we are not presented with the same pattern of generic similarities as in *Met-*

*calf.* And even more important, our decision in *Metcalf* was based on a form of inverse ratio rule analysis: the plaintiff's case was 'strengthened considerably by [defendants'] concession of access to their works'.... Here, there is no such concession of access as most of [plaintiff's] claims are based purely on speculation and inference." *Id.* at 1179 (internal citations omitted). As in *Rice,* here, there is no concession of access and the inverse ratio rule does not apply; thus, for this reason as well, *Metcalf* is not applicable.

that, the stories do not share any detailed sequence of events.

*Id.* at 1081 (internal citations and quotation marks omitted). Thus, the Court affirmed summary judgment in favor of defendants on the issue of substantial similarity. *Id.* at 1081; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49–50 (2d Cir.1986) (finding that "at the most general level, the movie and the book tell the same story"—that of policemen battling the hostile environment of New York's 41st Precinct—however, "differences in plot and structure far outweigh this general likeness.").

▇▇▇ As in *Funky Films*, *Homeless* and *Desperate Housewives* do share some basic plot similarities—the suicide of a leading character, a man with a mysterious past, the use of a disembodied voice—but the storylines of the main characters are vastly different, the themes of the two works are not similar, and, as discussed further below, the stories do not share a common sequence of events. As such, no reasonable jury could find that the plots of the two works are substantially similar.

#### b. Characters

▇▇▇ Generalized character types are not protected by copyright law. *Rice*, 330 F.3d at 1175; *Kouf*, 16 F.3d at 1046; *Olson*, 855 F.2d at 1451–52; *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945, 950 (9th Cir. 1954) (stating that characters ordinarily may not be copyrighted), *cert. denied*, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955); *Warner Bros. Inc. v. ABC*, 720 F.2d 231, 240 (2d Cir.1983). The Ninth Circuit, however, has "allowed copyright protection for characters who are especially distinctive. For example, cartoon characters may be afforded copyright protection." *Olson*, 855 F.2d at 1452.

▇▇ Plaintiff argues that David and Mike, and Suzanne and Susan are similar. The Court disagrees. Mike and David have little in common other than that they both have mysterious pasts that involve a dead woman. David is a homeless airline pilot who roams the neighborhood and eventually lives with Suzanne. At the beginning of the script, he is withdrawn and does not speak. The neighbors are repulsed and afraid of David and his appearance, but Suzanne, who recognizes his attractiveness under his dirty exterior, gives him a makeover. David becomes physically desirable to the other women, begins speaking, and pulls his life together. His story revolves around this transformation.

Mike, on the other hand, lives in his own house, and poses as a plumber. In the pilot episode, Mike is rumored to make a good living and is immediately "hit on by every divorcee in a three block radius." Mike is never homeless or otherwise withdrawn from society and he does not undergo any physical transformation.

Mike and David's "mysterious pasts" are also very different. In *Homeless*, David's wife dies from a drug overdose and David is charged with, and then acquitted of her murder. While David struggles with coming to terms with Mindy's death, he is not attempting to solve the mystery of how she died. Indeed, at the beginning of the screenplay, the neighbors are aware that David has already been acquitted of Mindy's death, and when he later tells Suzanne about Mindy, David appears to know how she died. In contrast, Mike in *Desperate Housewives*, does not know what happened to his ex-girlfriend Deidre, and comes to Wisteria Lane to find out. He is never charged with or acquitted of her murder. Instead, he learns that the deceased narrator and her husband, Paul, were responsible for Deidre's death. In resolving the mystery, Mike learns he has

a teenage son. These story lines bear little in common.

■ Susan and Suzanne are not similar. Although the women have similar sounding names, the characters do not have much in common. Suzanne is a workaholic and a fabulous cook. She is single and has no children. She is confident, and often acts as a source of support for her friends in need. Susan, on the other hand, is a klutzy divorcee with a teenage daughter. She is a terrible cook. She often appears frazzled and relies on her young daughter for support and advice.

The roles that the two women play in the works are also different. In *Homeless*, Suzanne is clearly the main character. The work revolves around her relationship with David, and to a certain extent, her relationship with John. Susan, on the other hand, is only one of four main characters in *Desperate Housewives*, each of whom is central to the progression of the series.

■ Nonetheless, Warwick–Smith's analysis suggests that the differences between the characters are actually what make them similar. Warwick–Smith states: "Sometimes attributes are reversed—Suzanne in [*Homeless* ] is clearly a good cook, preparing rosemary chicken for David, where in [*Desperate Housewives* ], Susan is a comically terrible cook. Mindy, in [*Homeless* ], is obviously an adulterer, where Bree in [*Desperate Housewives* ], is created as the opposite, a prim perfectionist and purist in the extreme. The opposites form a pattern." (Pl. Compendium Exh. 17, pg. 5.) As the law protects similarities in works, not opposites, the characters in *Desperate Housewives* do not copy the protected expression of the characters in *Homeless*.

Finally, none of the characters in *Homeless* are especially distinctive, such that they would warrant copyright protection.

*Compare Olson,* 855 F.2d at 1451–52 (finding a loose correspondence between the characters in plaintiff's and defendant's works, who were each Vietnam veterans that participated in various scams and adventures with each other, but holding that plaintiff's characters were not copyrightable); *with Warner Bros. Inc. v. ABC, Inc.,* 720 F.2d at 240–45 (copyright protection available for the character of Superman); *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc.,* 443 F.Supp. 291, 301 (S.D.N.Y.1977) (finding that the characters from "Star Wars" were protected from infringement); *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1355 (S.D.N.Y.1986) (personifications of the characters from "Amos 'n' Andy" on television were distinctive enough to be afforded protection).

### c. Mood and Pace

■ The moods of the two works are not similar. Although both works deal with dark subject matter, *Homeless* is a drama, while *Desperate Housewives* is a comedy. Plaintiff's work has few humorous elements. Warwick–Smith identifies two scenes as humorous: (1) where Mindy is laughing about her unhappy marriage before she dies, and (2) when Suzanne glues her shoe to a file in her office. (Warwick–Smith Report, at 111.) By comparison, Defendant's work is consistently funny throughout the entire show.

Further, *Homeless* is paced as a feature film; whereas, *Desperate Housewives* is paced as television series with multiple hour-long episodes.

### d. Setting

Both works take place on a street in a suburban neighborhood. *Homeless* is specifically set in California's San Fernando Valley. In contrast, *Desperate Housewives* has no defined geographic location.

■ There are several unique geographic cues or landmarks in *Homeless* to indicate that the story is set in Los Angeles—for example, the Ferris wheel at the Santa Monica pier, Pacific Palisades Park in Santa Monica, and the 405 freeway. However, none of these unique places appear in *Desperate Housewives*. Thus, the only similarity in setting between the two works is that they are both set in a suburban neighborhood. A generic suburban neighborhood is not a copyrightable expression.

Further, the physical settings of both works consist of commonplace settings such as houses, front yards, offices, restaurants, interiors of cars, and so on. There are no unusual or unique physical settings that appear in both *Homeless* and *Desperate Housewives*.

### e. Theme

■ The works also have different themes. The predominate theme of *Homeless* is that of transformation similar to the themes of *My Fair Lady* and *Young Frankenstein*, two films referenced in Plaintiff's screenplay. In *Homeless*, Suzanne sees something worthwhile in David and helps rehabilitate him back to a functioning member of society. The screenplay concludes with David and Suzanne having found domestic bliss.

*Desperate Housewives*, and specifically the relationship between Susan and Mike, does not have a similar rehabilitation theme. In *Desperate Housewives*, the underlying theme appears to be that the suburban life is much more complicated

than it seems, and that each person has their own private struggles to endure. In short, "the picket fence routine is a lot harder than it looks." (Def.'s Compendium Exh. E [*Desperate Housewives* Teleplay dated Sept. 15, 2002] at 18.) [21]

### f. Dialogue

■ To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate "extended similarity of dialogue." *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988). Ordinary words and phrases are not entitled to copyright protection, nor are "phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions." *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir. 1989). Here, the dialogue in each work is considerably different.

In his report, Warwick–Smith presents numerous dialogue comparisons which he concludes are similar; however, none of the scenes have the *same* dialogue. For instance, Warwick–Smith gives the following sets of specific lines of dialogue as evidence of copying:

| From *Homeless* | From *Desperate Housewives* |
|---|---|
| "You missing Mindy there David?" and "I wish David could see this." | "I miss you." |
| At a party at Mindy's house, Mindy says "He's so funny." "I wish David could see this. We used to have so much fun." | Gabrielle remarks that the party will be "fun." |
| John orders David to, "Stay out of this neighborhood" and ". . . stay out of this." | Susan tells her daughter to ". . . stay away from Suzanne." |

**21.** This theme is echoed throughout the *Desperate Housewives* teleplay, which concludes with the four main characters realizing that their deceased friend might have done something horrible just before her suicide. The teleplay concludes: "The four women remain FROZEN on the front LAWN as the camera pulls back. We *see* a man JOG by. Two girls are jumping rope. The camera pulls back even further to show another man is MOWING his lawn. Cars are PASSING. It's a beautiful day in SUBURBIA. And nobody seems to be DESPERATE." (Def.'s Compendium Exh. E [*Desperate Housewives* Teleplay dated Sept. 15, 2002] at 76.)

| Suzanne says "Mmm. That's working." | Rex says "Mmm. That is it." |

Although these lines contain similar words, the lines from *Homeless* are ordinary, common expressions that are not copyrightable. *Narell*, 872 F.2d at 911.

### g. Sequence of Events

*Desperate Housewives* and *Homeless* do not share any similar sequence of events, which Plaintiff's expert implicitly concedes. In arguing that the two works share a similar sequence of events, Plaintiff's expert picks specific scenes from both works, places them out of order, and then compares them as if both works have the same sequence of events. For instance, in his first example of a similar sequence of events, Warwick–Smith describes events from *Homeless* that appear on page 90 of the screenplay, then the events on page 116, then the events on page 45, then events on page 116 and 117, then events on page 52 and 53, and finally events back on page 116. (Warwick–Smith Report, at 10.) He compares this string of out-of-order events to events from the following scenes in *Desperate Housewives:* (1) Episode 2.17 pg. 16, 17, (2) Episode 2.17 at 18, (3) Episode 2.08 page 4, (4) Episode 2.08 at page 15. (*Id.* at 10–11.) By definition, events in Episode 2.08 *came before* events in episode 2.17. Thus, it is apparent Plaintiff's expert does not believe the "sequence of events" has to be *in sequence* within the works in question. *See Rice v. Fox Broadcasting*, 148 F.Supp.2d 1029, 1060–61 (C.D.Cal.2001), *reversed in part on other grounds, Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir.2003).

 Plaintiff's expert is incorrect. The sequence of events refers to the actual sequence of the scenes, not just having similar scenes out of sequence. In shuffling the events, Plaintiff's expert demonstrates that the two stories do not have a similar sequence of events.

## IV. CONCLUSION

Plaintiff has not introduced evidence demonstrating a triable issue of fact regarding Defendants' access to *Homeless.* Moreover, even assuming arguendo that a triable issue of access exists, no reasonable jury could conclude that there are any substantial similarities in plot, themes, mood, dialogue, characters, or sequence of events between *Homeless* and *Desperate Housewives.*

For these reasons, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.